[No. 10,041.]

## THE PEOPLE *v.* GEORGE BROTHERTON AND LEWIS BROTHERTON.

COMPETENCY OF JUROR.—The burden of establishing the incompetency of a juror is cast upon the party asserting it. The juror is presumed to be competent until his incompetence is affirmatively established.

CHALLENGE TO JUROR FOR IMPLIED BIAS.—The Appellate Court will not overrule the action of the Court below in denying a challenge for implied bias made to a juror in a criminal case, even where the answers of the juror appear contradictory, unless it is apparent that the Court below abused its discretion.

ORDER OF PROOF IN CRIMINAL CASE.—When two are jointly indicted, the prosecution may, on the trial, prove the declarations and acts of one made and done in the absence of the other, before proving the conspiracy between the-defendants, provided proof of such conspiracy is afterwards made.

FORGERY.—The alteration of a check already made, with intent to defraud another, is forgery.

RULE OF EVIDENCE AS TO EXPERTS.—On a trial for forgery committed by altering a check, by extracting writing therefrom and writing new words or figures in place thereof, a witness, who is not called as a scientific expert, may testify as to the chemical effect a powder, found in the possession of the defendants, had on writing in a check similar to that by the alteration of which the forgery was committed, and the check upon which the effect testified to by the witness was produced may be exhibited to the jury.

PROOF OF EVIDENCE OF DECEASED WITNESS.—On a second trial for an alleged crime, the prosecution may prove what a witness, who has died since the former trial, testified to on that trial.

PRESUMPTION IN SUPPORT OF JUDGMENT.—It will be presumed in support of a judgment in a criminal case, that testimony introduced by the prosecution worked no injury to the defendant, if the testimony is not contained in the record.

ERROR SUFFICIENT TO REVERSE JUDGMENT.—That a technical error was committed by the Court during a criminal trial is not enough of itself to produce a reversal of the judgment, but it must be such an error as produced an injury to the substantial rights of the defendant, and upon him is cast the burden of showing it.

INTENDMENTS IN SUPPORT OF JUDGMENT.—All intendments are in support of a judgment in a criminal case, so far as such intendments are consistent with the record.

ERROR MUST BE SHOWN IN CRIMINAL CASE.—A bill of exceptions showing error in the exclusion of evidence, on a trial in a criminal case must also show that the excluded testimony was material to the defendant, and that he was injured by its exclusion, or the judgment will not be disturbed.

EVIDENCE SUFFICIENT TO CONVICT.—It is not necessary that the evidence for the prosecution in a criminal case should show that the innocence of the defendant is impossible, in order to justify the jury in finding him guilty, but it is enough if such evidence demonstrate the guilt of the defendant beyond a reasonable doubt.

ALL PRESUMPTIONS ARE IN FAVOR OF THE RULING OF THE COURT BELOW. The refusal of the Court below to give an instruction, in a criminal case, which assumes that no other than circumstantial evidence was introduced by the prosecution, will not be held erroneous on appeal, if the record fails to show that none but circumstantial evidence was introduced.

APPEAL from the Municipal Criminal Court of the City and County of San Francisco.

George L. Howard, George Brotherton, and Lewis Brotherton were jointly indicted for having, on the fourteenth day of May, 1870, forged a check, of which the following is a copy:

"No. 1251.        SAN FRANCISCO, May 14th, 1870.

"The Bank of California pay to Hickox and Spear, or order, Fourteen Thousand Five Hundred and Sixty-one $\frac{25}{100}$ Dollars.

"14,561 $\frac{25}{100}$.        TREADWELL & Co."

Upon the trial, D. Hicks, a juror, having been called and sworn, on his examination by defendants' counsel, gave the following answer to the interrogatories propounded to him:

*Mr. Tyler* (attorney for defendant).—How is it with you?
A.    I have heard and read considerable about the affair, at the time of the arrest, and during the trial.
Q.    Did you read all that was published at that time?
A.    Well, a portion of it.
Q.    You heard it talked about?

A.   Yes, sir; I have heard it talked about considerably.

Q.   At the time you read or heard about it, did you form or express any opinion as to the guilt or innocence of the defendants?

A.   Well, no decided opinion; no fixed opinion.

Q.   Well, what do you mean by a fixed opinion? Did you come to the conclusion in your mind, one way or the other, as to their guilt?

A.   Well, I should judge from what I read, and from their being found guilty at the other trial, that they were the parties that were guilty.

Q.   You have that opinion now in your mind?

A.   Well, I presume I have.

Q.   To that extent it is unqualified?

A.   No, sir; I do not think it is unqualified.

Q.   What do you call an unqualified opinion? You say you think they are guilty from what you have read, and from the fact that they were once convicted?

A.   Yes, sir.

Q.   And you have heard nothing to change that opinion?

A.   No, sir; I have seen nothing to change that opinion.

Q.   Then you entertain that opinion still?

A.   Yes, sir; as far as it goes.

Q.   Have you expressed that opinion to anybody?

A.   I believe I have never said to any one that I thought they were guilty.

Q.   Could you say whether you have or not?

A.   Well, I did make a remark to-day, for the first time since this case has been up for this term, to one of the jurors.

Q.   What was that remark?

A.   That from the fact that twelve (12) men had found them guilty before, it was more than likely they were guilty.   I made some such remark.   It is the only time I have spoken in that way to any person.

Q.   That was to one of the jurors summoned here?

A.   Yes, sir; but I made the remark at the same time that it would not affect me in any way; that I was always governed by the evidence.

Q. I know you would try to be. The question is, whether you can be, or could be. If you were to go into that jury-box with that opinion, do you not think you would be more apt to receive the testimony which would go to confirm that opinion than otherwise?

A. I do not think I would be governed in that way. I think if I should go into the jury-box with such an opinion, and find the evidence was different from what I thought or had read, I should be as apt to find them innocent as guilty, because I am always governed by the evidence in a case—I endeavor to be.

Q. Well, you did form, at one time, an opinion as to their guilt?

A. Yes, sir; as I have stated.

Q. You attached no qualification to it at all? You did not at the time, in your reasonings, when you made up your mind in regard to the matter—that if the facts were so-and-so, taking what you read and heard to be true, your conclusion was so-and-so. You did not at the time, in your reasonings, make any qualifications?

A. As I told you, from what I read and heard, and from the fact they were tried and convicted once, I made up my mind that they were the guilty ones.

Q. From the fact that they had been tried and convicted once, you made up your mind in regard to their guilt?

A. Yes, sir; that is as far as I went.

Q. Then, to that extent your opinion was unqualified?

A. Yes, sir.

Q. You did not attach any qualifications to the opinions in your mind?

A. No, sir.

Q. That opinion still remains now?

A. Yes, sir; just as I have told you.

*Mr. Tyler.*—We challenge the juror for implied bias—for having formed an unqualified opinion.

Examination by counsel for the people:

*Mr. Campbell.*—I wish you would state whether the opin-

ion you formed was formed deliberately, upon examination of evidence of the facts of the case—whether it is a definite, decided, clear opinion, or whether it is a mere impression?

A.   I have just stated that it is not a fixed or decided opinion.   I perhaps naturally made up my mind from the fact of their being found guilty; and, as I have just stated, from reading the evidence, I came to the conclusion they were guilty.

Q.   What I want to ascertain is, whether you made up your mind fully on the subject of their guilt or innocence, at that time?

A.   Well, not positively; I would not say—I would not say under oath that I did not form a fixed or decided opinion, but I think I rather leaned toward their guilt.

Q.   Have you now a fixed or decided opinion?

A.   I have said that I have not.

*Mr. Campbell.*—We take issue on that challenge.

*The Judge.*—Mr. Hicks, have you ever had, in regard to this matter, such an opinion that, if you had been asked whether you believed the defendants were guilty or innocent, you would have answered, unhesitatingly, yes or no?

A.   Well, I don't think I have.

Q.   Do I understand you to say that you have, or have not, ever expressed an unqualified opinion as the guilt or innocence of the defendants?

A.   No, I have not—any further than I have just mentioned to-day.   I have talked considerably about the trial, during the term of the Court here; but I have never expressed any opinion further than I have stated.   I have talked with Mr. Hickox about it; although there was no expression of opinion about it by either of us; that was only for a minute.

*The Judge.*—I do not think the challenge is supported by the testimony.   I deny it.

To which ruling of the Court, in refusing to exclude said Hicks as a juror, for having formed an unqualified opinion of defendants' guilt, counsel for defendant then and there excepted.

Treadwell & Co. were dealers in agricultural implements

in San Francisco, and Hickox & Spear were bankers and brokers, and bought and sold greenbacks. By the custom in San Francisco bank checks were paid in gold coin, and this accounts for the fact that Howard received from Hickox & Spear $16,500, in National bank bills and legal tender notes for the check. Howard plead guilty when arraigned. The Brothertons were convicted, and appealed from an order denying a new trial.

The case was before this Court on a former appeal, and is reported in 43 Cal. 530.

The other facts are stated in the opinion.

*George W. Tyler*, for Appellants.

The refusal to sustain the challenge to juror Hicks was error. (*People* v. *Brotherton*, 43 Cal. 530.)

It was error to admit evidence of the acts and declarations of Howard in the absence of the Brothertons. (1 Greenleaf on Ev., Sec. 111, and cases cited.)

The alteration of the check was not forgery. (Sec. 73, Act Concerning Crimes and Punishments.)

The Court erred in permitting Lees to testify as to his experiments, he not being an expert. (*Oley* v. *Hoyt*, 2 Jones, N. C. 70.)

The Court erred in refusing to allow proof of Howard's testimony on a former trial. The only case sustaining the views of the Court is *Le Barron* v. *Crombie*, 14 Mass. 233; but of this case the reporter in a note to the decision observes, page 237: "This decision is supported by no authority, and is inconsistent with general principles." (See 1 Greenleaf on Ev., Sec. 168; *Jones* v. *Mason*, 3 Strange, 819.)

*John L. Love*, Attorney-General, and *Alex. Campbell*, for the People.

The juror Hicks was competent. Taking his whole testimony together it is evident that the opinion he formed was not unqualified. Although, like most jurors, some of his answers are given in loose and inaccurate phraseology, it is evident that he never formed anything more than a mere

floating impression as to the guilt of the defendants. In answer to the question of the judge, "Mr. Hicks, have you ever had in regard to this matter such an opinion, that if you had been asked whether you believed the defendants were guilty or innocent, you would have answered unhesitatingly, yes or no?" he replies: "Well, I don't think I have." This shows clearly that he never entertained any settled opinion on the subject, but a mere hypothetical opinion unaccompanied by malice or ill-will, and founded on hearsay. Hicks was clearly a competent juror, not only under the Statute of 1868, but under the authorities in this State and elsewhere. (*People* v. *Honeyman*, 3 Denio, 121; *People* v. *Reynolds*, 16 Cal. 128; *People* v. *Williams*, 17 Cal. 142; *People* v. *Mahoney*, 18 Cal. 180; *People* v. *King*, 27 Cal. 507.)

The third exception relates merely to the order of testimony, which was a matter entirely within the discretion of the Court, and the record shows clearly that such discretion was properly exercised.

The objection that proof of the alteration of the check could not be given under the indictment is untenable, because every material alteration of a check for a fraudulent purpose is an original forgery. It creates an entirely new instrument. This has been held repeatedly. (Wharton's Am. Cr. Law. 4th Rev. Ed. Sec. 1421; *Com.* v. *Ladd*, 15 Mass. 526; *Kegg* v. *State of Ohio*, 10 Ohio, 75; Roscoe's Crim. Ev. 488, 6 Am. Ed. from 6 London, and cases there cited.)

The idea that because the statute uses the word alter as well as the word forge, it is necessary to set forth in the indictment the altered instrument, has no foundation in reason. When a person falsely alters an existing instrument he forges the instrument as altered. The statute is somewhat tautological, but it does not change, or profess to change, any recognized legal meaning attached to any of the terms which it uses.

The testimony of Francis Wood was properly received. This point has been over and over determined in the affirmative, both in England and in many of the States of the

Union—but the case of the *People* v. *Murphy*, 45 Cal. 137, renders any discussion of it wholly unnecessary.

The testimony of Howard was properly excluded. When this case was tried, the common law rule in regard to the incompetency of witnesses, was in force in this State. Howard, if present in Court, could not have testified in regard to this transaction, because his character was so infamous that the law presumed he could not speak the truth. All the authorities concur in saying that the infamy of the crime committed, constitutes the disqualification.

And the reason why a man, however criminal he might be, was always a compétent witness until conviction and sentence, was, because the question of his guilt could not be collaterally investigated, and his infamy could not be said to be established until it was legally ascertained. But when he is legally ascertained to be guilty of an infamous offense, his infamy must necessarily relate to the act which led to his conviction. Howard is infamous because he forged the check which formed the subject of this indictment. His conduct then rendered his testimony unfit, in contemplation of law to be heard in a court of justice. At the former trial his evidence was received because he had not then been legally ascertained guilty of the offense. (*Baker* v. *Lord Fairfax*, 1 Strange, 101, Salk. 286; *Le Baron* v. *Crombie*, 14 Mass. 409; *Chess* v. *Chess*, 17 Serg. & Rawle.)

By the Court, WALLACE, C. J.:

The appeal is taken by the defendants from an order denying their motion for a new trial upon an indictment for the crime of forgery.

1. The first point made is that the challenge interposed by the prisoners to the juror Hicks was improperly overruled. The ground of the challenge was, that he had formed an unqualified opinion as to the guilt of the prisoners. It is unnecessary to go over the details of the examination of Hicks, and his answers made to the numerous questions put to him upon the point involved in the challenge. Some of his answers as to the nature of the impres-

sions he had formed are not altogether consistent with some others given by him. But we have had occasion heretofore in other cases to remark upon the apparently almost unavoidable inaccuracies usually observable in the answers made upon such examinations, produced, in most instances, however, by the leading forms of the questions habitually put by counsel on the one side and the other by which the juror is usually led, incautiously, to contradict himself by not carefully observing the nice shades and differences suggested, or oftener concealed, in the questions themselves, as to the actual state of the mind of the juror, or the nature and character of the opinion or impressions he may have formed. This case does not seem to be of an exceptional character in that respect. The burden of establishing the incompetency of a juror is, however, upon the prisoners. He is presumed to be competent until his incompetency is affirmatively established. It is not ordinarily enough, therefore, to support an exception taken to the action of the Court below in overruling a challenge made on this ground, that a conflict, frequently more apparent than real, is developed upon the point by the examination. Much weight under such circumstances is rightfully to be attributed to the views of the Court below in disposing of the challenge. The demeanor and manner of the juror under examination, hardly less than the mere expression in which his answers are couched, constitute an important element in the judgment to be arrived at upon the point of his competency or incompetency by reason of an opinion formed, or an impression created upon his mind. We, of course, can have no opportunity here to observe the demeanor or manner of the juror, nor by that means, to form the estimate of his character as being a fair-minded man, or otherwise, which is afforded to the Court below; and we think that under such circumstances we ought not ordinarily to disturb the conclusion arrived at below upon the point, but that the rule usually applied where the evidence is conflicting upon a contested fact ought to apply in such case. We have looked into the bill of exceptions taken to the denial of the challenge interposed in this case, and are of opinion that Mr.

Hicks was not sufficiently shown to have formed an unquali-
fied opinion as to the guilt of the prisoners, and that the
challenge for implied bias on that ground must be con-
sidered to have been correctly denied.

2. The next point made by the counsel for the prisoners
is, that "the Court erred in permitting the acts and decla-
rations of Howard, in the absence of defendants, to be
given in evidence before any proof had been offered by the
people to show any connection between Howard and the
defendants."

The bill of exceptions in support of this point is as
folllows:

"Upon the trial of said cause, the counsel for the people
offered evidence to the effect that, on the day prior to the
passing of the alleged forged check by the defendant How-
ard, in the indictment named, said Howard went to the
office of Treadwell & Co., in the indictment mentioned, and
applied at their store to purchase some gardening imple-
ments; that he selected goods to the amount of $14.25,
which he requested to have forwarded to San José, ad-
dressed to Mrs. Mary Dole; that he then paid the sum of
$50 in gold coin to the clerk, and requested him to give him
(Howard) a check for $35.75, payable to the order of Mrs.
Mary Dole, by way of change, alleging that the friend by
whom he was going to send the money to Mrs. Dole was in-
temperate, and might spend the money if it was in a cash
form; that thereupon a check of said Treadwell & Co.,
signed by Treadwell & Co., for the sum of $35.75, was
given to him, which was, subsequently, fraudulently and
without the assent of Treadwell & Co., altered to the check
in the indictment set forth, and fraudulently passed, on the
next day, by Howard, on Hickox & Spear, in the indictment
named, Howard receiving from them in exchange therefor
$16,500 in National Bank bills and legal-tender notes; and
the counsel for the prosecution further offered to show, at
a subsequent stage of the case, a number of facts tending
to prove the complicity of the defendants Brotherton with
Howard in the entire transaction, and to show, among other
things, that the defendant Howard and the defendant

Lewis Brotherton came together to San Francisco under assumed names, in February, 1870, remained there a short time, and then returned to the Eastern States.

"That about the fifth of May, 1870, the defendants, Brotherton and Howard, came together from the Eastern States, and on that day arrived at Stockton, and all three went under assumed names, and so registered themselves at a hotel there; that, on the next day, Lewis Brotherton came on to San Francisco and registered himself at a hotel there under under an assumed name; that, two days afterward, George Brotherton and Howard came on to San Francisco and registered themselves there, at the same hotel, under assumed names; that all three left the hotel at the same time, viz: on the 8th of May, 1870; that the Brothertons then took lodgings on Stockton Street, San Francisco, and Howard took lodgings on the same street, and in the immediate vicinity; that they were frequently together during their stay in San Francisco; that on the afternoon of the day of the passage of the forged check by Howard, he and the Brothertons were together at Howard's room on Stockton street; that they left that room together about 3 P. M., having with them two valises, and went toward the room of the Brothertons; that on that day, near four o'clock P. M., Howard was arrested at the Sacramento boat, having in his possession a portion of the money obtained on the forged check; that on the same afternoon the Brothertons left on the Stockton boat; that on the next day, at Stockton, they bought tickets for Omaha, and that one of the bank bills paid by them for their tickets was one of the bills obtained on the forged check from Hickox & Spear; that they were then arrested as they were about to get on the cars for Omaha; that upon searching, a portion of the bills obtained from Hickox & Spear by Howard upon the forged check, was found on the person of each of the Brothertons ; that their baggage was taken from the baggage-car, and that in one of their valises was found a bottle containing a certain powder, which, on analysis, was found to contain twenty-five per cent. of hydrate of potassium, and seventy-five per cent. of chlo-

rate of soda ; that such compound was not known as
being useful for any chemical, medical or other purpose
except that it, in combination with muriatic acid, was suit-
able for the purpose of extracting ink from paper; that
among the baggage of the Brothertons were also found
several camel's hair pencils, on one or more of which were
found traces of muriatic acid, and of the above-mentioned
compound ; that certain shirts found in their baggage were
found, on examination, to correspond in marks and num-
bers with shirts found in Howard's possession; that camel's
hair pencils were found in Howard's baggage on his arrest;
that there was found on the persons of the two Brother-
tons, and traced to their possession, bank bills and treasury
notes of the denominations obtained from Hickox & Spear,
amounting precisely to the sum of $11,000, having the
same general appearance with those so obtained, and some
of which, found on the persons of each of them, were the
identical notes obtained by Howard from Hickox & Spear;
that the Brothertons, when questioned about the money
found upon them, said it was brought by them from the
Eastern States; that a large portion of the money so found
upon them consisted of treasury notes issued for the first
time from the sub-treasury at San Francisco, subsequent to
their arrival in this State.

"The counsel for the defendants, before any of the evi-
dence proposed as aforesaid had been given, and at the
time the first question, to which any such evidence was in
response, was asked, objected to any evidence of the acts
or declarations of Howard in the absence of the Brother-
tons, unless a connection between him and the defendants
on trial should be first shown by evidence tending to show
the conspiracy sufficient in the judgment of the Court to go
to the jury on that point; and the Court held that the
order of the evidence was a matter of discretion with the
Court, and that the Court would receive in the first in-
stance the evidence as to Howard's acts and declarations in
the absence of the defendants in obtaining the genuine
check and its subsequent alteration, and the obtaining of
the $16,500 upon it, on the understanding that the prose-

cution would afterwards furnish evidence connecting the defendants with the transaction, to which ruling the defendant's counsel then and there excepted.

"The prosecution then furnished evidence tending to show the obtaining of the check for $35 75 from Treadwell & Co; by Howard, and its fraudulent passage in an altered state, to Hickox & Spear on the next day, and his fraudulent obtaining from them the above-mentioned sum of $16,500, which evidence was followed by the prosecution by evidence of the facts mentioned in the foregoing offer of the prosecution, and by evidence of other facts tending to connect the defendants on trial with Howard in the entire transaction."

It will be seen that it is not claimed that the evidence of the alleged conspiracy between Howard and the Brothertons, when actually given, was not in itself sufficient to entitle the prosecution to prove the acts and declarations of Howard, done and made without the presence of defendants at the office of Treadwell & Co., and at the other places, but only that the evidence of the conspiracy should have been given first in point of time at the trial. In this respect, however, there was obviously no error committed. No authority is cited going to show that there was.

Mr. Greenleaf, in his work on evidence, Volume I, Section 3 (relied upon for this purpose by the counsel for the prisoners), after stating the general rule that a foundation must first be laid by proof sufficient in the opinion of the Judge to establish, *prima facie*, the fact of a conspiracy between the parties, adds that: "Sometimes, for the sake of convenience, the acts or declarations of one are admitted in evidence before sufficient proof is given of the conspiracy; the prosecution undertaking to furnish such proof at a subsequent step of the case."

He adds that the order in which the proof may be given "rests in the discretion of the judge" when the circumstances are peculiar and urgent. The proof of the conspiracy itself was in point of fact afterwards supplied by the prosecution, as they had undertaken to do when they applied for leave to prove the acts and declarations of How-

ard, and it is evident upon the whole case that the jury were not misled to the injury of the prisoners by this change in the usual order of the proofs.

3. The next point made for the prisoners asserts a distinction in point of law between the forgery of the check and its material alteration made for a fraudulent purpose. The indictment in the first count, alleging that the prisoners "feloniously, willfully and knowingly, did make, forge and counterfeit a certain false, forged and counterfeited check, with intent to defraud," it is claimed that under that allegation it was not competent for the prosecution to prove, as they were permitted to do, that the prisoners, by the use of chemical appliances upon the Treadwell check, and the subsequent interpolation therein of spurious words and figures, feloniously altered it to a simulated check for $14,561, instead of the genuine check for $35 75, which it originally was. By the Act of this State concerning crimes and punishments, it is enacted that every person who shall falsely make, alter, forge, or counterfeit any check, with intent to damage or defraud another, shall be deemed guilty of forgery. It is apparent, upon this reading, that whatever inherent distinction may exist in the nature of things between making an instrument and altering one already made, the statute has declared that falsely to do either, with intent to defraud another, amounts to the crime of forgery. Irrespective of the statute, however, the alteration of an existing instrument, so as to give to it a different effect, was forgery, (Roscoe Crim. Ev. 488). "Any alteration of a genuine instrument, in the material part, whereby a new operation is given to it, is a forgery of the whole," (2 Whart. Am. Crim. Law, § 1,421). And when a genuine instrument is so altered, the forgery may be specially alleged, as constituted by the alteration, or the forgery of the entire instrument may be alleged. As altered, it is a forgery of the whole, (*State* v. *Weaver*, 13 Ired. 491). We think, therefore, that the objection in this respect was properly overruled.

4. It is next insisted that there was error in admitting proof of what Francis Wood had testified to at the former trial of the prisoners upon this indictment—Wood having

in the meantime deceased. The testimony thus produced was as to certain matters happening at the Brooklyn Hotel. What matters these were, and whether material or not, the record is silent. It must be presumed, therefore, in support of the judgment below, that they were of no materiality in the case, and worked no injury to the substantial rights of the prisoners at the trial. But irrespective of this, it is settled here that the prosecution, on the second trial of the prisoners for this crime, had a right to prove what the deceased witness testified to on the former trial. (*People* v. *Murphy*, 45 Cal. 137.)

5. It appears by the bill of exceptions, that "upon the trial, the testimony showed that a powder, composed of three parts of hydro-carbonate of soda to one part of chlorate of potash, was found in the baggage of one of the defendants. The counsel for the people placed Isaiah W. Lees upon the stand as a witness, who testified that he was a police officer; that he had used a portion of the powder found by him in the defendant's baggage, in connection with muriatic acid, for the purpose of extracting ink from paper; that during the progress of the former trial of this cause, he had taken a portion of said powder, and with it, in connection with muriatic acid, and with the use of a camel's hair brush, extracted the ink from two checks—one prepared at said trial by the counsel for the defendants, and one by Mr. Cullen, in imitation of the original check obtained by Howard from Treadwell & Co., and written with the same kind of ink; that the ink was extracted from the body of the checks without affecting the signatures, and leaving the parts where the ink was extracted perfectly white, and the texture of the paper uninjured, and the two checks were produced and offered by the prosecution to be exhibited in evidence.

"The defendants' counsel, in due time, objected to the foregoing evidence, on the ground that Lees was not an expert, and that it was not competent to show what effect the powder had in combination with other substances. The Court overruled the objection, and permitted the two checks to be given in evidence and exhibited to the jury,

to which ruling defendants' counsel excepted.    Said checks were then exhibited to the jury."

The testimony of Lees did not purport to give his mere opinion as to whether powder, composed and applied as this was, would have the effect of extracting the ink from the paper.    He was not examined as an expert, or person having a peculiar knowledge of art or science, and whose opinion upon the point would therefore be admissible in evidence—but only as to the fact or phenomenon that certain effects followed the application of the powder in the instances which he witnessed.    Whatever, if any, other objection might have been taken to this evidence as a fact, it is clearly not obnoxious to this objection.    We do not think the reasoning of the Supreme Court of North Carolina, in the case of *Oley* v. *Hoyt*, 2 Jones, R. 70, satisfactory upon this point    In fact, the views of the Court in that case seem to proceed, in the main, if not altogether, upon the supposition that the supposed experiment was a mere trick of the defendant in the action, and that the witness, an ignorant man, had been practiced upon in that manner by the defendant for the purpose of manufacturing evidence in his own favor.    We are of opinion that the objection taken below in this respect was correctly overruled.

6.    The next exception was reserved upon the following facts:

"It was proved upon the trial, by defendants, that Howard, the person jointly indicted with the defendants, when he was arraigned, and before any trial had taken place, pleaded guilty to the charge against him;

"That the case was tried against the defendants, and the jury disagreed;

"That the sentence against said Howard was suspended by the Court until after the second trial;

"That the second trial of defendants took place at the September term of said Court, 1873, when defendants were found guilty and sentenced to the State Prison for fourteen years;

"That upon said second trial said Howard was sworn and examined as a witness on behalf of defendants; and his

testimony, both on his direct and cross-examination, was taken down by a short-hand reporter, accurately; that after said second trial, and before the present trial, said Howard was sentenced by said Court to imprisonment in the State Prison of California for the term of fourteen years for the offense charged in this indictment, where he is now serving out his sentence.

"Counsel for defendants then offered in evidence the testimony of said Howard, on their behalf, taken as aforesaid, at the second trial.

"Counsel for the people objected to said evidence as incompetent, on the ground of infamy, and that if present, he would not be a competent witness.

"The Court sustained the objection, and ruled out the evidence, to which ruling the counsel for defendants then and there excepted."

It will be observed that nowhere in the record does the proffered testimony of Howard appear, nor is its substance given, nor does the bill of exceptions state that it was material for the prisoners, nor is there anything set forth by which we can see that its exclusion operated an injury to the substantial rights of the prisoners at the trial. Our judgment here, it must be remembered, is to be given "without regard to technical error or defect which does not affect the substantial rights of the parties."

That a technical error has intervened at the trial is, therefore, not of itself enough to warrant our interference.

The prisoners must go further, and affirmatively show in some way that their substantial rights have been injuriously affected by the error complained of. The burden is upon them to do so. Mere intendments indulged here are in support of the proceedings below, so far as such intendments are consistent with the record. This rule has frequently been asserted in this Court. In *People* v. *King*, 27 Cal. R. 514, the propriety of an instruction given at the trial came under consideration. The jury had been instructed that no circumstances had been shown in evidence which were sufficient to reduce the crime charged in the indictment to manslaughter. If, in point of fact, such circum-

stances had been shown at the trial, then the instruction was erroneous, otherwise not. The evidence, however, was not set out in the record, and it was therefore intended here in support of the judgment, that there had been no such circumstances in proof, and the instruction was accordingly held correct, this Court in that connection saying "that in the absence of any statement or bill of exceptions embodying the evidence, or declaring its purport or tendency, so far as may be necessary to point the exception, we must presume in favor of the action of the Court below, upon the principle that the party who alleges error must show it. This, however, must be taken with the qualification that when the action of the Court below is manifestly erroneous, under any and every conceivable state of facts, this Court will review it, notwithstanding the evidence may not have been brought up." This is but a re-statement, in more apt language, of the general principle announced here as early as *The People* v. *Butler*, 8 Cal. R. 440, and afterward asserted and applied in *People* v. *Dick*, 34 id. 663, and in *People* v. *Williams*, 45 Cal. 25, and it must be considered as settled in this Court. For the reason, then, that the bill of exceptions fails to show that the excluded evidence was in any respect material to the defense of the prisoners, their exception upon this point must be overruled. It is proper to add that the lately effected changes in the law as to the competency of persons adjudged guilty of felony to testify, render the question argued by counsel upon this point of no practical importance in the future.

7. There was no error in the refusal to give the twenty-second instruction asked by the prisoners. It was obscurely drawn, and the substitute given by the Court, states the point in clearer language.

8. The next point of error relied upon arises upon the refusal of the Court to give the whole of the following instruction asked by the prisoners:

"It is the jury's duty to weigh every hypothesis suggested by defendant's counsel, and every hypothesis conceivable by them, although not suggested, and see if they will account for the circumstances in proof, upon the theory of the

innocence of the defendants; because to warrant a conviction upon substantial evidence, the circumstances must not only be entirely consistent with the theory of the guilt of the defendants, but they must be inconsistent with any other rational conclusion. [You are not warranted in excluding any theory favoring the defendants, however improbable that theory may be—however improbable may be the hypothesis. Yet if it account for the fundamental criminative facts in proof—if there be any such—you should adopt that theory and acquit the defendants."]

The Court gave the instruction, except so much of it as is included in brackets, and it is insisted with much earnestness that this also should have been given. After an extended philological discussion, involving the precise definition of the words "rational," "irrational," "probable," "improbable," etc., the counsel admits that, after all, the real meaning of the entire instruction as asked is " that the defendants must not be convicted unless their innocence is shown to be impossible."

To say that the proof must show their innocence to be impossible would necessarily be to say that it must demonstrate their guilt, since nothing short of such demonstration could exclude the possibility of innocence. We have some difficulty therefore in understanding the argument of counsel on file, in which, while it is admitted that the purport of the instruction as asked is that the prisoners should not be convicted " unless their innocence is shown to be impossible," it is at the same time claimed that this means nothing more than that " the evidence must show to a moral certainty that they are guilty." The degree of certainty upon which the jury were justified in convicting the prisoners, termed moral certainty, does not amount to demonstrative certainty of guilt, or certainty which necessarily excludes the possibility of innocence; on the contrary, it supposes and entirely consists with the possibility of innocence, and it is itself nothing more than the comparatively measurable, limited degree of certainty, " that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it"—a cer-

tainty of the guilt of the prisoners not indeed beyond all possible or imaginary doubt, but beyond all reasonable doubt. The instruction, as asked, does not advise the jury to consider if there be a reasonable doubt of the guilt of the prisoners in rendering their verdict—their attention is directed to the consideration of "any theory favoring the defendants, however improbable that theory may be," * * * "if it account for the fundamental criminative facts in proof" and advises them that they "should adopt that theory and acquit the defendants." They are invited to lay aside their own natural reason and common sense, as well as the established rules of law, by which their deliberations should be guided, and to find their verdict for the defendant upon even the most trivial or fanciful supposition, or the most remote conjecture. We think that the instruction, as asked, was correctly refused.

9. The only point remaining to be considered, arises upon the refusal of the Court to give the following instruction, asked by the prisoners:

"Where the only evidence introduced against a prisoner is circumstantial, the circumstances proved and established must be as strong, conclusive, and convincing to the mind as if the facts sought to be established had been proved by the direct evidence of one good credible witness testifying to a personal knowledge of the facts."

The instruction assumes as a postulate that no other than circumstantial evidence was introduced by the prosecution. If the facts did not support the assumption then the instruction was correctly refused for that reason. It would in that case be merely abstract, and calculated to mislead the jury. The evidence not being sent up, and nothing appearing in the record to support the assumption upon which the proposed instruction proceeds, it must, upon the views expressed under the sixth point, be considered to have been correctly refused. We have thus adverted to all the points relied upon by the counsel for the prisoners, and it not appearing that any error was committed by which their substantial rights were affected at the trial, the motion for a new trial was correctly denied. Order affirmed.