## Indian Pocket *v.* The State.

1. Special Venire — Practice. — There is in this State no provision of statute or rule of practice which requires the presence of the defendant or his counsel, in a criminal case, at the drawing of a special *venire*.

2. Same — Case Stated. — In a murder trial, the jurymen were drawn by a deputy-sheriff from an ordinary cigar-box, with a lid on the side, but not a sliding lid, and the names so drawn were simply recorded by the clerk. *Held*, that section 21 of the jury-law (Acts Fifteenth Legislature, 82) applies more particularly to the organization of juries for the regular weekly panels, and that another and different box than one with a sliding lid may be used in drawing the jury under a special *venire*. The objection that the clerk did not actually and in person, with his own hand, draw the jurors, is purely technical; and against such objection this court will sustain the judgment by purely technical reasons, when the appellant could have suffered no injury. See the opinion *in extenso*, for treatment of these questions, holding that under the proceeding in this case the objections are trivial.

3. Evidence — Confessions made freely, without compulsion or persuasion, are entirely competent, and may, as in the present case, serve both as a confession of guilt and as evidence of the *animus* with which the act was done.

4. Same. — Confessions of a defendant after arrest, he being duly warned beforehand that his statements might be used against him, are admissible in evidence against him.

5. Charge of the Court. — Though requested charges be unnecessary, they may be sometimes given with propriety; but it is not error in the court below to refuse them when the law applicable to the case is correctly set forth in the general charge.

6. Same. — The court below is not required to repeat, upon request, charges substantially embodied in the general charge, or to charge upon a state of facts which does not exist; but, in the event of a reasonable doubt, it is best that the charge asked, if a proper one, be given.

Appeal from the District Court of Lavaca. Tried below before the Hon. E. Lewis.

The indictment was for the murder of Leonard Hyde, in Lavaca County, on February 14, 1878. The conviction was for murder in the first degree.

S. D. Peterson, being sworn for the State, testified that on the evening of February 14, 1878, himself and deceased

were in the crib of witness, near Hallettsville, Lavaca County, shucking corn. While there, the appellant came to the crib and asked witness to lend him a gun, as he had just seen a drove of wild turkeys outside of witness's field. Witness told appellant to go up to his house, near by, and get the gun. At this juncture, deceased spoke up and said that he would go with appellant and help kill the turkeys. The two went off together towards the house to get the guns, and this was the last that witness saw of either appellant or deceased, until, a short while afterwards, being informed by Pat Boyle that deceased had been killed, he went and found deceased dying, a few steps from the " big gate " of witness's field. Deceased had been shot in the forehead, and his brains were coming out from the wound. He expired a few minutes after witness reached him. About three-quarters of an hour had elapsed since appellant came to the crib on horseback and asked for the gun, and the killing must have occurred about four o'clock, P. M.

Pat Boyle, referred to, was a tenant of witness, and lived in a house situated on the farm, and near the " big gate " alluded to. Deceased, who was a young man of nineteen or twenty years of age, also lived with witness. Witness identified the appellant, and proved the venue in Lavaca County.

Pat Boyle testified, for the State, that he lived in a house near the " big gate " on Peterson's farm, and that on the evening of February 14, 1878, at four o'clock, he saw the deceased and appellant coming along the road, inside the field, from Peterson's house, deceased walking and appellant riding. Witness noticed that appellant had a double-barrelled shot-gun at the time, and saw deceased hand him a pistol. Witness then asked where they were going, and being told that they were after a drove of turkeys seen outside the fence, he remarked that he would go too, as he " wanted to see the fun." Witness joined the deceased, walking along with him behind the appellant. When within

about forty yards of the "big gate," appellant dropped the gun. He reached down and picked it up; and after riding along about forty yards, appellant suddenly levelled the pistol which he had in his hand, and saying to deceased, "G—d d—n you, if you follow me any further I will kill you," shot deceased, the ball penetrating the forehead. Witness, who was then within ten or fifteen feet of deceased, turned and went rapidly back towards the "big gate." When witness looked back from the gate, he saw appellant starting from the position in which he did the shooting, and saw him as he rode off, until he reached the corner of the field-fence, when he turned east. Witness then went after and returned with Mr. Peterson. They found deceased shot with a bullet through the head, the brains oozing from the wound. He lived but a few minutes after witness and Mr. Peterson reached him. Witness did not see appellant afterwards, until he saw him under arrest, in June, as he (appellant) fled the country. Deceased had no weapon on his person when he was shot.

Mrs. Peterson, wife of the witness S. D. Peterson, sworn for the State, testified that, on the evening of the killing, appellant and deceased came to the house, and appellant asked for the gun, which he said he had borrowed from the husband of witness. The gun was delivered, and the two retired to a little side room, where the shot and powder for loading was carried them by the little son of witness. Witness heard them laughing and talking together, and presently saw them go off together, appellant with the gun and deceased with a pistol, towards the "big gate," appellant riding and deceased walking. Witness observed that the appellant had a pistol fastened to the pommel of his saddle when he rode up. The two had not been gone long before witness heard the report of a gun or pistol; and shortly Pat Boyle came running to the house, and reported that appellant had shot deceased.

Henry Lemons, a freedman, next testified, for the State, that he lived in the neighborhood of Mr. Peterson when deceased was killed. On that evening, appellant rode up to the house of witness, having with him a gun and two pistols. He shot a dog ; and, holding a pistol out in his hand, said to witness, "Do you see this? I have just killed one man with it, and if you listen you will hear it kill another."

John Lafore, a freedman, testified, for the State, that on February 14, 1878, he lived at the farm of Mr. Dud Clark, on Smother's Creek, in Lavaca County. That late on the evening of that day appellant rode up to his house, stopped awhile, fed his horse, and rode off about eight or nine o'clock, having asked directions to the little railroad-town of Flatonia. He told witness that he had killed a young man named Hyde, on Mr. Peterson's place, about four miles distant.

C. S. Hays, for the State, testified that he was constable of Bosque County (precinct No. 1) on June 17, 1878, and on that day arrested appellant. After the arrest, witness called him "Indian Pocket," and appellant said that he had not heard that name in a long time. Witness then read him the proclamation of the governor offering a reward for his arrest, when appellant said, "Yes, I killed that fellow Hyde, and I reckon they will stretch my neck for it when I get down in Lavaca County." Before appellant made this statement, witness warned him that whatever statement he might make about the matter might be used in evidence against him. After the arrest, appellant was conveyed from Bosque to Lavaca County, and lodged in jail.

Here the State rested. Mrs. Smith was introduced by the defence. She testified that, on the day of the killing, appellant came to her house, which is about one mile distant from Peterson's, and wanted to get the pistol of witness's husband. He took the pistol without the consent of witness. Witness gave him dinner. Witness thought him

drunk, as he fell down twice on the steps. He behaved, otherwise, very politely, and did nothing else objectionable. He used no improper language. Appellant left the house of witness about two or three o'clock, going towards Mr. Peterson's house.

Mr. Brown, for the defence, testified that at the time of the killing he lived near the town of Hallettsville. On that evening, about one or two o'clock, he saw appellant coming along the public road, running his horse and hallooing. Witness had never seen him so conduct himself before, and judged that he was drunk, though he was not near enough to know it.

Frank Edwards, a freedman, was next introduced by the defence, and testified that, on the day of the killing, the appellant came to the house where witness was living. He got into a difficulty with the women, and was misbehaving himself. He did many improper things, such as cutting up the bed-clothing, knocking the bottoms out of tubs, etc. Witness asked him to quit; at which he got mad, and witness knocked him down. He went off then, threatening to come back and kill witness. He had a bottle of whiskey in his pocket. He drank the whiskey, and threw away the bottle as he left. Witness thought he was drunk. He was much excited and enraged when he went away.

Jane Dare and Catherine King, freedwomen, corroborated the testimony of the witness Edwards, except that the latter testified that she did not hear appellant threaten to get a gun and kill Edwards,— a threat which, if made, witness would have heard. Jane Dare adds, that while she thought appellant drunk, that he was not so drunk that he did not know what he was doing.

S. D. Peterson and Mrs. Peterson testified for the State, in rebuttal, that when they saw appellant, — the one at the crib, when he asked for the gun, and the other at the house, when it was delivered to him,— they discovered no evidence

of intoxication.   Appellant was cheerful, laughing, and polite, and if drunk, displayed no evidence of it.

*W. H. Crain,* for the appellant.   On the first day of the February term, A. D. 1879, of the District Court, on motion of the county attorney, a *venire* of sixty men was ordered to be drawn.   A common cigar-box, with a lid upon the top, held the slips upon which the names of the jurymen were written.

Under the direction of the judge, in open court, Pleasant Green, a deputy-sheriff, proceeded to draw the names, and as each was drawn he announced it to the clerk, who wrote it down.

Neither the defendant nor his counsel was present, nor had they been notified to be present.   The list of names drawn was appended to the writ and delivered to the sheriff. When the case was called for trial, the defendant presented his exceptions to the special *venire;* which were overruled, and an exception saved to the ruling of the court.

Defendant contends that, as the bill of exceptions shows, he was confined in jail, and was not present when the *venire* was drawn; that neither he nor his counsel was notified when the drawing would take place; and that, as there was no waiver of this right, the judgment of the court should be reversed.   In support of this proposition, he cites the case of *Gibson* v. *The State,* 3 Texas Ct. App. 438 *et seq.,* where it is held that, unless waived, the defendant's right to be present when his motion for a new trial is heard cannot be denied him.   Certainly he is equally, if not more, interested in the drawing of the jurors who are to try him for his life.

If a defendant in a misdemeanor case, even, were denied the right to be present at the drawing of the jury, his conviction could not be sustained.   Does not this rule apply with greater force in a capital case?

The defendant further suggests that one important requirement of the jury-law of 1876 was wholly disregarded, in this : that the box used in drawing the jurors was not such a box as is provided for in the law, viz., a box with a sliding lid. If this provision of the law can be violated, why enact it, and why use a box at all? A common hat would be equally as useful as a cigar-box.

The object of this provision seems to be, that the entire list of names shall be selected by lot ; that no name shall be seen till drawn ; and that when the clerk draws a name, he shall slide the lid back while he writes the name down, and then shall reopen the box to draw another, thus proceeding till the number required shall have been drawn.

In connection with this objection, it may be well to consider the objection raised by the defendant to the drawing of the special *venire* by any other person than the clerk of the court. The law provides that the drawing shall be done by the clerk, in open court. In this case it was done by a deputy-sheriff.

It is true that the district judge considered that the mode of drawing was a substantial compliance with the statute, as appears from his explanation given in signing the bills of exceptions. But defendant urges that *a drawing actually done by a deputy-sheriff and recorded by the clerk is not, either wholly or substantially, a drawing done by the clerk.*

It could with equal force be claimed that the drawing was done by the judge, assisted by the deputy-sheriff. The clerk was not the *actor* in the drawing. He was merely the *recorder* of the *act* of the deputy-sheriff. The box lay open, and the deputy-sheriff, as he drew a name, announced it, and the clerk wrote it down. Can this be regarded as a compliance with the law? Defendant thinks not.

The case of *Monroe Harrison*, 3 Texas Ct. App. 558, was reversed, partly because the court ordered seventy-five men to be drawn for the special *venire;* and yet this order

of the court would seem to enure to the advantage of the·
defendant.

"A jury formed in any other manner than as prescribed
by the act [Act Fifteenth Legislature] is not a legal
jury, and a conviction before any jury not organized in ac-
cordance with the statute, if taken advantage of at the
proper time and in the proper manner, must, in a case of
felony, be set aside on appeal." *Elkins* v. *The State*, 1·
Texas Ct. App. 540.

In the case of *Hicks* v. *The State*, decided at the present
Galveston term, *ante*, p. 488, in regard to the failure of the·
County Court to swear the sheriff at the commencement of
the term, the court use this language:

"A court would have as much right to ignore and disre--
gard any other section of the law as this." And in the
same case the court, quoting from *Shackleford* v. *The
State*, 2 Texas Ct. App. 385, say: "When the Legislature·
prescribes rules for the selection of juries, and repeals all
laws and parts of laws in conflict with the provisions of the
act [to which we have referred], *the courts must observe the
law in force.*"

Is not the provision of the law requiring the clerk to draw
the special *venire* in open court as essential a safeguard for
the protection of a defendant charged with a capital offence
as that provision which requires the court to administer the
oath to the sheriff?

And if the failure of the court in this particular caused
the reversal of a case of simple misdemeanor, ought not
the failure of the clerk to draw the special *venire* to be con-
sidered of sufficient importance to authorize a reversal in a
case in which the defendant's life is involved?

In the case of *Hasselmeyer* v. *The State*, 1 Texas Ct.
App. 700, the objection was urged for the first time in the
motion for a new trial, that the jury had been drawn by the
judge, instead of the clerk; and the court held that the ob-

jection came too late, but should have been presented when the drawing took place.

This case, however, differs from Hasselmeyer's in this particular: that the former is a capital case, the latter an ordinary felony. In the case before the court, defendant could not object to the mode and manner of drawing the names to be summoned by virtue of the special *venire*, *because he was in jail*, and had not been ordered by the court to be brought into court to witness the drawing; nor was his counsel present, or notified by the court to be present, at the drawing, as will appear by reference to the bill of exceptions; nor does defendant admit that a notification to his counsel would operate as a waiver of his right to be present.

It could be well argued, had the court caused defendant to be brought into court during the drawing, that the objection to the mode and manner of drawing should have been then and there presented; *but when it appears that the court denied the defendant his right to be present at the drawing*, thereby preventing him from urging objections to the mode and manner thereof, it would be the quintessence of judicial cruelty to hold that the defendant should have presented his objections to the mode of drawing at the time the drawing was done. The court would, in that case, first deny him the right to be present at the drawing, and then punish him because he was not present.

The able judge who presided at the trial states in the bills of exceptions that there was not any notification given to defendant's counsel, other than the public notice that the drawing would take place at a certain time. Were this to be regarded as notice to the defendant or his counsel, still the latter could not have objected to the mode of drawing, because an attorney cannot represent a defendant in a felony case, in his absence, unless his right to be present is waived expressly or by implication.

The very object intended by the requirements of the common law, followed by our superior tribunals upon this subject, is that the inferior court may have an opportunity to remedy the evil complained of, and that the defendant may save exceptions to the action of the court in case the remedy is not applied.

It is urged, therefore, in behalf of defendant, that he should have been permitted to be present when the drawing of the jurors took place; and that, having been absent in jail, he could only except to the mode and manner of the drawing at the first opportunity which offered, viz., when his case was called for trial. *Long* v. *The State*, 4 Texas· Ct. App. 85.

The defendant, moreover, contends that the definition of murder contained in the first instruction to the jury is incorrect, in this: that it states that murder is distinguishable from every other species of homicide except that which would make the offence manslaughter; and that the court erred in charging that all murder committed in the attempt at the perpetration of arson, rape, robbery, or burglary is murder in the first degree, as this part of the charge was not applicable to the facts; and it is equally as erroneous to give an instruction inapplicable, as to fail to give one that is applicable.

It was a question material to be submitted to the jury, whether the defendant's mind was sedate and calm, and whether he formed a cool, deliberate design to kill deceased while his mind was in that state. Defendant showed by his witnesses that shortly before the homicide he was drunk; and that his mind was enraged from a severe blow received from one Edwards, which knocked him down; and that while in that frame of mind he went in the direction of Mr. Peterson's, where the homicide was committed.

True it is that Peterson and wife testified that defendant did not seem to be drunk, but the conflict of testimony

should have been reconciled by the jury, under pertinent charges upon the subject, and not by the judge.

The court not only failed to charge upon this question, but refused to give the instructions asked by the defendant.

In the case of *Wasson* v. *The State*, 3 Texas Ct. App. 481, the court say : " It is the duty of the court to charge the law applicable to the facts, and whenever *there are facts that would influence a jury, in any reasonable probability*, it is the duty of the court to submit the law in charge which is pertinent to those facts."

It is respectfully submitted, in behalf of defendant, that the charge of the court in this case was not calculated to call the attention of the jury to the material questions presented by the testimony for their consideration, but would be equally as applicable to any case of murder that might be called for trial in any court in the State, being merely a dissertation upon the abstract question of murder and its distinctions.

*Thomas Ball*, Assistant Attorney-General, and *J. R. Burns*, for the State.

WHITE, J.    In this case, the appeal is from a judgment of conviction for murder in the first degree.    Appellant was charged in the indictment with having, on February 14, 1878, murdered one Leonard Hyde, in Lavaca County. He was arraigned and tried on February 11, 1879.    Counsel was assigned him by the court, and, as shown by the record, conducted his defence with marked ability on the trial below, whilst in this court they have also appeared by printed briefs in his behalf, distinguished alike in force of argument and commendable zeal for a gratuitous and unfortunate client.

Many questions are raised as to the correctness of the proceedings on the trial, all or most of which are reca-

pitulated in the fifteen different grounds enumerated in the assignment of errors. We do not propose to discuss them *seriatim* or in whole, but only such as in our judgment are most pertinent and important, or novel in character.

1. Two preliminary questions are made with reference to the special *venire*, which were submitted in a motion to quash, which, technically speaking, was a challenge to the array. First, that neither defendant nor his counsel was notified or present in court when the *venire* was drawn; and, secondly, that the special *venire* was not drawn in conformity with the requirements of the statute. Two reasons are assigned for this latter objection, viz. : that the box from which the names of the jurymen were drawn was not such an one as the law provides shall be used for such purposes; and that the names were not drawn from the box by the clerk, upon whom alone the law imposes that duty.

With regard to the first proposition, we are aware of no provision of statute or rule of practice which confers upon a defendant or his counsel in a capital case the right to be present at the drawing of the special *venire*. True, in some of the States — as, for instance, in Alabama — the court, while not expressly deciding that it was necessary, have held that the personal presence of the prisoner at such time would be the safer practice. *Henry* v. *The State*, 33 Ala. 389 ; *Hall* v. *The State*, 40 Ala. 698, and authorities cited. We are not disposed, even if necessary, to controvert the proposition that the practice would be " a safer one ; " as, indeed, would be the personal presence of the prisoner whenever any step is taken in his case. What we hold is, that such right is nowhere conferred by statute ; and, in our opinion, under the provisions of the present grand-jury law with regard to special *vinires*, it cannot well be perceived how his presence or absence could affect any apparent right of his in any appreciable manner. Acts Fifteenth Legislature, 82, sec. 23.

Under the old law, " the challenge to the array " was allowed in and limited to cases where the officer had acted corruptly in summoning the jury. Pasc. Dig., art. 3034. That was at a time when the whole selection of the *venire* was confided, in a great measure, solely to the officer executing the writ. Now such chances for corruption under the present system must be rare indeed, and confined almost exclusively to cases where talesmen are summoned to supply deficiencies. The authorities cited by counsel, upon this proposition, are not analogous. Our statute provides the method by which a defendant is notified of the names of persons summoned on a special *venire*. Pasc. Dig., art. 3022.

With regard to the second proposition, the facts were that the box from which the names of the jurymen were drawn was an ordinary cigar-box, with a lid on the side, but not a sliding lid ; and the names of the jurors were drawn from this box by one Green, who was a deputy-sheriff, in the presence of the judge, in open court, whilst the clerk simply recorded the names so drawn. The section of the statute upon which the first point is predicated is section 21 of the jury-law, and reads: " The clerk shall write the names of all the jurors entered of record, on separate slips of paper, as near the same size and appearance as may be ; and when a jury is wanted for the trial of any case, the same shall be drawn from a box, after the slips of paper above mentioned shall have been deposited therein and mixed. The clerk shall provide and keep for that purpose a suitable box, with a sliding lid." Acts Fifteenth Legislature 82. This box, we take it, was intended more especially for ordinary use when the names of jurors on the weekly panels were to be drawn. Sec. 20. In section 22, providing for ordinary jury trials, the language is, " the clerk shall draw from *the box*." In section 23, providing for special *venires*, the language is, " and the tickets be placed *in a box*, which shall be well shaken up, and from *this box* the clerk, in the

presence of the judge, in open court, shall draw the number of names required for said special *venire*," etc.

This language, it would seem, indicates clearly that the box to be used on occasions of special *venires* may be another and different box from the one with a sliding lid provided for ordinary juries. If so, then the structure or make of this latter box is not prescribed, and an ordinary cigar-box, with any kind of a lid, might answer the purpose. Where no injury is shown to have been done, and not much probability that an injury under the circumstances could have been done, this court will avail itself of strictly technical reasons to support and sustain the action of the court below against mere technical objections. *Johnson* v. *The State*, 4 Texas Ct. App. 269 ; *The People* v. *Brotherton*, 47 Cal. 388. The other objection, that the clerk did not actually in person, with his own hand, draw from the box the names of the jurors, as shown by the facts, is of the same character, and purely technical. In *Hasselmeyer's Case*, 1 Texas Ct. App. 690, the question, though raised, was not decided, because not taken advantage of at the proper time. That was the first instance, so far as we remember, in which the point was made. In several of the other States, under statutes of similar character to ours, analogous questions have been adjudicated.

In *Carpenter* v. *The People*, 64 N. Y. 483, it was held that " a challenge to the array of petit jurors at a Court of General Sessions for the city and county of New York alleged that the jurors were not selected by the commissioner of jurors of said county, and that neither he nor any one on his behalf attended the drawing ; but that the jurors were selected by one appointed by the mayor as commissioner, and that the statute under which the mayor acted was unconstitutional. *Held*, that the challenge showed upon its face that the jury were selected by an officer *de facto*, whose acts, in the exercise of the functions of the office, were valid as to the public, and whose appointment could

not be questioned collaterally; and that, therefore, a demurrer to the challenge was properly sustained.''

In *Hunt* v. *Mayo*, 27 La. An. 197: '' Under the act of 1868, Revised Statutes, 2127, the requirement was that the jury must be drawn by the parish judge, clerk, and sheriff. The drawing for the term was made by the parish judge, clerk, recorder, and the sheriff. Therefore, all the officers required by law to draw the panel were present, and officiated in the act. The placing in the order of the judge, for the drawing at that term, the additional officer — the recorder — was doubtless an oversight, and may be regarded as surplusage. *Held*, the objection to the drawing has no weight.''

In *Mapes* v. *The People*, 69 Ill. 523, it was held: ''When the office of county clerk was divided in a county, the fact that a person acting as county clerk for mere county matters assisted in the drawing of a jury, instead of the clerk who attended to the business of the court in probate and other matters, was regarded as no ground for a challenge to the array, he being *de facto* a county clerk, and the objection was considered trivial.'' In the opinion the court further say, in this latter case: '' We are not inclined to regard with favor mere trivial objections, interposed for no other purpose than to obstruct the administration of the law.''

So, in the case under consideration, the object, spirit, and intention of the law — which is, to secure a fair and impartial jury — was not, so far as we can see, violated. The drawing was done in open court, in the presence of the judge, from a box with a lid upon it, and the names were recorded as drawn, by the clerk. How the defendant could possibly have been injured in any manner by the fact that the deputy-sheriff drew the names from the box cannot be perceived. *Ray* v. *The State*, 4 Texas Ct. App. 454.

2. Another objection assigned as error is, that the court improperly admitted in evidence the confessions of the defendant. Shortly after the murder, defendant said to

the witness Lemons, holding his pistol in his hand, "Do
you see this? I have just killed one man with it [the pis-
tol], and if you listen you will·hear it kill another." This
confession was made freely, without compulsion or persua-
sion, and was entirely competent, both as a confession and
as evidence of the *animus* with which the act was done.
Pasc. Dig., art. 3126. "Acts and admissions, or other
language of the prisoner, even after the mortal stroke or
killing, may often be pertinent evidence tending to show
express malice at the time of the killing." *The Common-
wealth* v. *Jones,* 1 Leigh, 670; *McCoy* v. *The State,* 25
Texas, 33.

Again, when the defendant was arrested, in Bosque
County, by Hays, a constable of that county, that officer,
who was a witness, testified that "defendant said, 'Yes, I
killed that fellow Hyde, and I reckon they will stretch my
neck for it when I get down in Lavaca County.' Before he
made this statement, I warned him that whatever statement
he might make about this matter could be used in evidence
against him." Under the provisions of our statute with
respect to confessions made after arrest, this testimony was
perfectly legitimate. Pasc. Dig., art. 3127.

3. The charge of the court, whilst not as elaborate as,
perhaps, it might have been, embraced the law applicable
to the facts proven. Some of the number of special charges
asked by defendant's counsel might with propriety have
been given; but we cannot say that they were essential, or
tended to present the law as applicable to the facts directly
connected with the homicide more correctly than as it was
set forth in the general charge. A district judge, it is true,
is not bound to repeat charges already substantially given,
or to charge upon a state of facts which, in his opinion, do
not exist; but it is a safe rule that, whenever a reasonable
doubt might arise as to the applicability of the instructions
asked to the facts adduced on trial, the court should rather

give the instruction, if a proper one, than have the case
subjected to the risk of a reversal for the want of such a
charge. And oftentimes a failure to do so necessitates, use-
lessly, a discussion of questions which the district judge
should not have permitted the record to become encum-
bered with.

All the evidence sought with regard to defendant's intox-
ication was permitted to be introduced by him, to prove the
mental *status*, and the court did charge the jury fully upon
murder in the second degree.   *Colbath* v. *The State*, 4
Texas Ct. App. 76.

We are of opinion that the charge was a sufficient presen-
tation of the law applicable to the case.   All the witnesses
who testified to the acts, appearances, conduct, and conver-
sation of the defendant at the time of and just immediately
preceding the killing, stated that, in their opinion, defend-
ant was sober; or, rather, that he exhibited no indications
of intoxication.

This disposes of all the material questions complained of
as error.   With reference to the other errors assigned, we
do not think them well taken, and therefore not necessary
to be considered in this opinion.

The facts exhibit a wanton, reckless, unprovoked taking
of human life, under circumstances which disclose a total
want of motive, much less of justification or excuse.   Why
the defendant should have shot down the deceased as was
done, — a young man going with him upon a hunt, in all the
confidence of friendship, — without a word of difference or
controversy having taken place between them, is one of
those unaccountable circumstances which sometimes occur to
startle us with its enormity, and impress us with the fiendish
malignity of a heart fatally bent upon mischief.   His sub-
sequent boastful declarations fully evince the character of
the malice which actuated the foul deed.   His flight is a
circumstance exhibiting his own consciousness of his guilt.

And his statement to the officer who arrested him, — " I killed that fellow Hyde, and I reckon they will stretch my neck for it when I get down in Lavaca County,"— was not only confession of guilt, but also a just condemnation of himself to the gallows for his crime.

We have been unable to see a single material error in this record for which we would be warranted in interfering with the verdict and judgment rendered in the court below, and the judgment is therefore affirmed.

*Affirmed.*