**Filed 09/11/2017**

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051942 |
| v. | (Super. Ct. No. 11CF2479) |
| ALAN KEITH HUNTER and JAMES STEPHAN PASCHALL, | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Alan Hunter.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant James Paschall.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Theodore M. Cropley and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.                    *          *          *

A jury convicted Alan Keith Hunter and James Stephan Paschall of first degree murder (Pen. Code, § 187, subd. (a); all further statutory references are to this code) under the provocative acts doctrine for the slaying of their accomplice in a botched robbery at a jewelry store. The jury also convicted defendants of attempted second degree robbery (§§ 664, subd. (a); 211; 212.5, subd. (c)) and, in a bifurcated proceeding, the trial court found each had suffered a prior serious or violent felony conviction (§§ 667, subds. (d), (e)(2)(A); 1170.12, subds. (b), (c)(2)(A)). The trial court sentenced Hunter and Paschall each to a term of 30-years-to-life in prison, consisting of 25 years to life for the murder count and a five year enhancement for their respective prior convictions. The court stayed sentencing on the attempted robbery count under section 654.

Defendants assert the trial court erred in upholding a codefendant attorney's claim of work-product privilege in declining to turn over a report of an interview the codefendant's attorney and the attorney's investigator had conducted with a jewelry store victim. The codefendant had pleaded guilty to reduced charges by the time defendants requested the interview midtrial or, alternatively, requested to call the codefendant's attorney to testify about the interview. Defendants assert the interview was relevant to the provocative acts doctrine because it naturally would touch on *why* the victim shot at the unarmed accomplice (Desmond Brown) whose death formed the basis of the murder charge against defendants. In particular, if the victim stated in the interview that he shot Brown because of Brown's aggressive conduct, rather than because of another robber's violent acts, that would aid the defense theory that Brown was solely responsible for his own death, relieving them of vicarious liability under the provocative acts doctrine. As our Supreme Court has explained, however, the Penal Code does not provide for discovery among codefendants. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1095 (*Thompson*).) This is consistent with the general rule in litigation that each party is responsible for his or her own investigation and trial presentation. *Thompson* recognized

2

exceptions exist to ensure the defendant's right to a fair trial. (*Id.* at p. 1096.) But none apply here, particularly where defendants' chief claim of the value of the codefendant's interview — that it was conducted entirely in the shopkeeper victim's native language — turned out to be inaccurate, and where neither defendant suggested he could not secure an interview with the shopkeepers. In these circumstances, there was no infringement of defendants' right to a fair trial. Defendants also challenge the sufficiency of the evidence to support their murder conviction under the provocative acts doctrine, but there is no merit in that claim and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The evidence at trial showed Hunter and Paschall conspired with five other men to rob the Monaco Jewelers store in San Juan Capistrano. George Boozer, Eddie Clark, Sr., his son Eddie Clark, Jr., Robert Avery, and Desmond Brown were the other members of the conspiracy. Some of them cased the store several days before the robbery to confirm it carried "high end" jewelry and to look for blind spots in the store's security cameras. All seven met at Boozer's house the night before the heist to finalize their plans and assign roles.

In particular, Avery was tasked with seizing control of the store and confiscating the recording tape they assumed the security system used.[1] In the meantime, the other men would remain outside the store. For their part, Hunter would act as a lookout and Paschall would drive a getaway car. According to Boozer, who later testified under a plea deal, the group discussed whether to use firearms and Paschall encouraged Avery to take a gun into the store. The following morning, Hunter drove Paschall to San Bernardino where Paschall stole a getaway car.

---

[1] As it turned out, the store manager recently had installed a new system that allowed for live monitoring of events through the security cameras, including through store personnel cell phones, but he inadvertently failed to activate the recording feature.

3

Later that morning, the robbers put their plan into action. On June 24, 2011, at approximately 11:00 a.m., Avery entered Monaco Jewelers wearing camouflage fatigues. Jason Gulvartian, Jr., who was working at the time, asked Avery if he could help him, but dropped to the floor when Avery pointed a pistol at him. Jason crawled behind a safe where his mother-in-law was also hiding.[2]

Avery ran behind the jewelry display cases and through the doorway separating the showroom from the offices in the back of the store. Aram Pashaian, the store's manager, had noticed Avery enter the store and, believing he looked suspicious, removed his gun from his drawer and placed it on his desk. Avery approached Pashaian, did not see Pashaian's gun on the desk behind him, pointed his firearm at Pashaian's head, and called out to him, "Come here, you motherfucker." Avery towered over Pashaian even though Pashaian stood six feet tall. Avery grabbed Pashaian around his neck and shoulders with one arm and pointed his gun at Pashaian's chest. Pashaian moved backwards, knowing that Jason Gulvartian, Sr., (Gulvartian) was behind him. Gulvartian had his own gun and fired three shots at Avery. Avery fell to the ground on the third shot, dragging Pashaian with him.

Brown and Clark, Jr., had entered the store after Avery, wearing stockings over their heads. Gulvartian saw Brown charge toward him with what appeared to be a gun in his hand, but it was actually a cell phone. Gulvartian fired two shots at Brown, who fell backwards. Gulvartian later testified he shot Brown because he was running toward him with what appeared to be a gun, but he also testified Avery's attack "had a lot of effect" on his (Gulvartian's) decision to shoot Brown.

In the midst of the shooting, Gulvartian told Pashaian in a panic that he was out of bullets. Pashaian stood up and retrieved his weapon from his desk. Brown was on one

---

[2] We refer to Jason by his first name to avoid confusion with his father, who was also in the store, as we discuss below.

4

knee, getting to his feet, when Pashaian fired one shot at him. Pashaian's account at trial suggested Brown dropped to one knee, got up again, and continued to move toward him; he was not even sure he had wounded Brown, though Brown eventually fell and did not get up. Pashaian had attempted to fire a second shot at Brown, but his gun jammed. Pashaian believed Brown was armed, but it turned out he was only carrying a cell phone. Pashaian testified that Avery's attack influenced his decision to shoot Brown, but he would not have shot Brown if Brown had not moved toward him. Pashaian did not think he had shot at Clark, Jr., but admitted he was not "not 100-percent sure."

After Clark, Jr. fled, Pashaian approached Avery, checked to see if he was dead, and removed his gun from his reach. He then called 911 and reported the attack. Pashaian requested that ambulances be dispatched to the scene. When asked if the two robbers that had been shot were responsive, Pashaian stated he believed they were dead, but expressed concern that they had been moving earlier.

The five surviving robbers managed to escape the scene without being apprehended. Police responded to the robbery, cordoned off the area, and investigated the crime. They later located and arrested defendants and Boozer, Clark, Sr., and Clark, Jr., and the latter three eventually pled guilty. Boozer and Clark, Sr. testified at trial, explaining the preparations for the robbery and how it appeared to them to unfold from their respective vantage points outside the store.

The defense rested without presenting any affirmative evidence, having attempted to discredit on cross-examination Gulvartian's and Pashaian's claims that Avery's conduct contributed to their decision to shoot Brown.

II

DISCUSSION

A.    *Defendants' Attempt to Obtain the Results of a Codefendant's Investigation*

5

Defendants contend the trial court erred in declining their request during trial to call the attorney who represented a former codefendant to testify or to turn over a report of a pretrial interview the attorney and his investigator conducted with Gulvartian. Defendants believed the interview necessarily included discussion of why he or he and Pashaian shot Brown, whose death formed the basis for the murder count against defendants. Defendants' primary defense at trial was that Brown charged at Pashaian and Gulvartian, after Avery had been neutralized, and therefore defendants were not liable under the provocative acts doctrine for Brown's death.

Defendants believed the interview, conducted at least in part in Arabic, was essential to impeach the shopkeepers' testimony on redirect that Avery's actions contributed to their decision to shoot Brown. That testimony undercut defendants' claim that Brown was solely responsible for his demise based on his own independent provocation in charging while seemingly armed, after Avery already was dead. Before assessing defendants' claim the trial court erred in concluding the interview was shielded as attorney work-product or because defendants had not subpoenaed the attorney or his interview report, we briefly review the provocative acts doctrine.

1.    *The Provocative Act Doctrine*

"Under the provocative act murder doctrine, the perpetrator of a crime is held vicariously liable for the killing of an accomplice committed by the third party." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 581 (*Briscoe*).) If the killing occurs during the commission of an offense that does not include an intent to kill, such as robbery or burglary, "the mere participation in the underlying offense is not sufficient," rather, "[t]he provocative act must be something beyond that necessary to commit the underlying crime." (*Id.* at p. 582-583.) The doctrine "has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct,

and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander." (*People v. Cervantes* (2001) 26 Cal.4th 860, 867 (*Cervantes*).) The provocative act must "ha[ve] a high probability—not merely a foreseeable possibility—of eliciting a life-threatening response from the person who actually fires the fatal bullet." (*Briscoe*, at p. 582.)

Accomplices may bear liability for an instigating perpetrator's actions (*Briscoe*, *supra*, 92 Cal.App.4th at p. 583) even if there is "more than . . . one provocative act." (*Id.* at p. 585.) Thus, in *People v. Garcia* (1999) 69 Cal.App.4th 1324 (*Garcia*), the defendant participated in a home invasion with at least two other men, one named Quezada and the other, Alvarez. Upon gaining entry to the victim's home, Quezada fired a shot into the ceiling on the first floor, below the victim's bedroom, prompting a gun battle between the victim and the invaders. (*Id.* at p. 1327.) During the shootout, Alvarez pointed his gun at the victim, who shot and killed him, and the victim also killed Quezada in the ensuing firefight. (*Ibid.*)

The appellate court upheld the surviving defendant-accomplice's conviction for vicariously murdering Alvarez based on Quesada's provocative act of discharging a handgun into the victim's ceiling. (*Garcia*, *supra*, 69 Cal.App.4th at p. 1329.) The court explained that although Alvarez committed an additional provocative act when he pointed his gun at the victim, and did so after Quezada's initial provocation, the defendant would be "relieved from liability for the death of Alvarez only if Alvarez's actions were the sole cause of his own death. (*Id.* at p. 1332.) But *Garcia* observed that "[f]rom the facts here, the trial court was entitled to believe that Quezada's provocative act set the gun battle into motion and that Alvarez's pointing of the gun at [the victim] was merely part of the chain reaction that led to Alvarez's death." (*Ibid.*)

7

If, however, among several acts occurring around the same time, "only one of them actually provoked a lethal response, only that act may constitute the provocative act on which culpability for provocative act murder can be based." (*Briscoe*, *supra*, 92 Cal.App.4th at p. 584.)  Nor may a surviving accomplice be held liable where "the deceased provocateur accomplice is the sole cause of his own death." (*Garcia*, *supra*, 69 Cal.App.4th at p. 1331.)  In *People v. Antick* (1975) 15 Cal.3d 79, 83 (*Antick*), for example, the defendant and his accomplice, Bose, burglarized a home.  Later, officers approached a car suspected to have been used in the burglary, found Bose in the driver's seat beside a revolver, and ordered him out of the car. (*Ibid.*)  Antick was nearby outside a house and approached when the officer ordered Bose to put his hands on the hood of the car.  Bose drew a second gun and shot at the officer, who returned fire.  Another officer shot and killed Bose when Bose ignored the officer's order to stop. (*Ibid.*)  The Supreme Court reversed Antick's murder conviction for Bose's slaying.  The high court explained that Bose's provocative act did not result in the unlawful killing of *another* human being, as necessary for murder, but instead in his own death.  Reasoning that because Bose could not be guilty of murder in causing his own death, the court held "it is impossible to base defendant's liability for this offense upon his vicarious responsibility for the crime of his accomplice." (*Antick*, *supra*, 15 Cal.3d at p. 91.)

Here, defendants were not charged with murder for Avery's death, only Brown's, on the theory that Avery's provocative acts above and beyond participating in a robbery contributed as a substantial factor to Brown's death, for which defendants bore vicarious liability.  Defendants attempted to establish at trial that Brown's conduct in charging Gulvartian and Pashaian with what appeared to be a gun in his hand caused his own death, and whatever role Avery may have played initially no longer had any bearing because it was clear he was dead or incapacitated.  Defendants pointed to the fact that

8

Clark, Jr., was allowed to escape the store unharmed. Pashaian explained he did not shoot at Clark, Jr., because he was unarmed and appeared to be frightened. Gulvartian thought he shot at Clark, Jr., but he had testified he earlier ran out of ammunition shooting at Brown. Pashaian was "not 100-percent sure" whether or not he (Pashaian) tried to shoot at Clark, Jr.

The evidence also was in conflict whether Pashaian and Gulvartian believed Avery was dead. Gulvartian thought that because of the unnatural posture of his body on the ground, Avery may have been "pretending" or "playing possum," but on the other hand, Gulvartian left Avery "with the gun right next to his hand" when Gulvartian went to confront Brown. Similarly, Pashaian testified he stepped on *Avery's* hand *after Brown* was dead "to make sure that he's . . . not alive," suggesting he may not have been sure Avery did not pose a threat when Pashaian shot at Brown. But it appears that before stepping on Avery's hand, Pashaian had told the 911 operator the two attackers were both "finished" barring something "miraculous." At the close of the prosecution's case, the trial court had denied defendants' motion for acquittal (§ 1118.1) based on their theory Brown caused his own death. (See *Briscoe*, *supra*, 92 Cal.App.4th at p. 584 ["When the chain of causation is somewhat attenuated, the jury decides whether murder liability attaches or not"]; see also *Cervantes*, *supra*, 26 Cal.4th at pp. 871-872 [proximate cause is typically a jury question].)

2. *The Relevant Procedural History Regarding the Bittar Interview*

The prosecution's case was winding down when defendants asserted they were entitled to discovery concerning a pretrial witness interview that Clark, Sr.'s attorney, Frank Bittar, and Bittar's investigator had conducted with Gulvartian. The record is unclear whether Pashaian was also present at the interview. Defendants sought either a report of the interview if a report had been prepared or, in the alternative, to call Bittar to the witness stand to testify about the contents of the interview. Because

9

Gulvartian and Pashaian testified Avery's conduct influenced their decision to shoot Brown, defendants believed the interview was crucial for impeachment if either victim disclosed at the outset of the case that they shot Brown primarily or only because he was charging at them.

The issue arose when appellant Hunter's trial attorney noticed that Bittar was not present when Clark, Sr., testified, but instead a deputy public defender stood in for Bittar. Bittar had offered to share the interview with the other defendants soon after he conducted it at the outset of the case, but withdrew the offer when Clark, Sr., accepted a pretrial plea offer contingent on testifying at trial. During a break in Clark, Sr.'s testimony, Hunter's attorney explained to the trial court his concern that "I don't necessarily believe that Mr. Bittar is not present because he's busy," but instead "he understands that I am potentially gonna ask that he be called as a witness."

Bittar was present in court that afternoon during the medical examiner's testimony, and the trial court convened in chambers with Bittar and defendants' attorneys. Hunter's attorney explained his interest in the interview, which he believed had been conducted in Arabic, because Gulvartian in particular "has vacillated . . . from one position" to another on why he shot Brown "depending only [on] who's asking the question . . . ." The trial court asked Bittar if he memorialized "some type of a report" following the interview, which Bittar confirmed.

Bittar explained, "I visited the shopkeepers leading up to this case, actually well before the trial, the first initial trial setting. I went down there with an investigator. The shopkeepers are Armenian from Lebanon. I am from Damascus, Syria. I happen to speak Arabic. I said 'hello' to them in Arabic, said a few kind of ingratiating words, 'how are you?' type of thing. And then we went in English because my investigator was there, and they proceeded to tell us what took place."

10

After the interview, Bittar acknowledged he had shared with the attorney's for Clark, Sr.'s codefendants the fact "that we've done investigation" because "I wanted us to be on the same page as we went into trial." But he explained to the trial court that with the plea deal, "Obviously, things changed. I have an interest for my client only." When Hunter's attorney called him to request the report, Bittar recounted, "I told him, 'Things changed. I'm not interested in revealing that report. That is classical work product.'"

When Bittar suggested defendants should have done their own investigation, Hunter's attorney rejoined that "I did send my investigator." Neither Hunter nor Paschall suggested their attorneys had been unsuccessful in obtaining an interview. Bittar added that when Hunter's attorney "persisted" in requesting the report pretrial, "I told him flatly, 'That's just not gonna happen. File a sub[poena], whatever you need to do. But that's just not gonna happen."

The trial court confirmed Bittar had an investigator with him when he conducted the interview, and ordered Bittar to return the next morning with a copy of the interview report. The court observed, "First thing I have to do is take a look at it. And, you know, that's really the recommended way to do it. So I'm gonna just do that myself. I'm not [going to] disclose it to anybody."

The next day, Bittar and the deputy public defender, Van Camp, met with the trial court in camera to discuss whether to disclose the report, and the trial court sealed the reporter's transcript of the hearing.[3]

After the in camera hearing, back in open court with the jury absent, the trial court explained Bittar and Van Camp "brought up some good . . . reasons why [the report] shouldn't be turned over." The court directed Bittar "to keep that, not destroy it, have it available, and if we need it sometime in the future . . . , we'll have it." The court explained, "I think the way this should have been done is . . . by way of subpoena. And I

---

[3] Van Camp's first name does not appear to be in the record.

11

don't think I can just arbitrarily say, 'Turn that over.'" Hunter's attorney suggested he would like to call Bittar as a witness, regardless of whether he could get the report, because Bittar "became a witness" when he personally conducted the interview. Paschall's attorney added, "As far as the issue of being subpoenaed, he was compelled to appear in court for his client, which, obviously, since he's appearing in court, he's available . . . . And Mr. Curls [Hunter's attorney], did tell him that he would call him as a witness. [¶] So I don't think that they have a problem with notice, if he agreed to it. He showed up and appeared."

Curls observed, "I'm sitting here right now with my client in a murder trial. The witness is 4 feet away from me. I want to put him on the stand. It's that simple." But the court also explained it denied the request on grounds that "everything you're [going to] ask him is work product[.]" When the court expressed concern that in "every single case we have, co-defendants [will] be saying to one another, 'I want to know everything that you've got. Give me everything that you have,'" defense counsel explained they were "not asking for a general fishing expedition into Mr. Bittar's file," but rather, "[I]f Mr. Bittar had a conversation in Arabic with Mr. Gulvartian, that is not work product. And when he tells me that, he has made himself a witness."

Van Camp revealed that "the record should reflect the court has not reviewed the report." The trial court acknowledged, "I haven't reviewed it," concluding, "I don't think I have a duty to review it" because "I don't think they have a right — a duty to turn it over." The court noted defense counsel had not provided "any authority for me to order them to turn it over." Counsel requested "for appellate review purposes" that "the report . . . be put in the court file" under seal, but the court declined. When the court noted that "if the Court of Appeal wants [me] to take a look at it and orders me to do it," Bittar volunteered, "I certainly will have that available." But the court concluded, "[L]egally, at this point, they don't have an obligation to turn it over."

12

3. *The Trial Court Properly Denied Defendants' Request for Witness Statements Obtained by a Codefendant*

The parties' initial briefing on whether the trial court erred in denying defendants' request to review Bittar's interview with the shopkeepers focused on the attorney work-product doctrine, as discussed in *Coito v. Superior Court* (2012) 54 Cal.4th 480, 499-500 (*Coito*). While that doctrine is important, as we discuss below, its relevance is necessarily constrained by the context of defendants' discovery request for witness statements obtained by a codefendant in a criminal trial. Accordingly, we asked the parties to submit supplemental briefing on *Thompson*, *supra*, 1 Cal.5th 1043, which postdated the parties' briefs. There, the high court recently observed that "no provision in the statutory scheme governing criminal discovery explicitly or even impliedly requires one codefendant to disclose any evidence to another codefendant." (*Id.* at p. 1094.)

*Thompson* explained that "[d]iscovery in criminal cases is governed by section 1054, which was added to the Penal Code by Proposition 115 in 1990." (*Thompson*, *supra*, 1 Cal.5th at p. 1093.) "Thus," the *Thompson* court further explained, while "section 1054.1 states that '[t]he *prosecuting attorney* shall disclose *to the defendant* or his or her attorney all of the following materials and information . . .'" and "section 1054.3, subdivision (a) requires a '*defendant* and his or her attorney [to] disclose *to the prosecuting attorney*' certain materials," "[n]othing in the language of these two provisions requires one codefendant to provide discovery to another codefendant." (*Thompson*, at p. 1094, italics added by the Supreme Court.) The *Thompson* court noted, "We have adhered strictly to this language; for example, we held in *People v. Ervin* (2000) 22 Cal.4th 48 that although reciprocal discovery of penalty phase evidence between a defendant and the prosecution is generally required by section 1054, 'no statutory basis exists for the discovery of codefendants' penalty phase witnesses' [citation]." (*Thompson*, at p. 1094.)

13

*Thompson* acknowledged that though "section 1054, subdivision (e) sets forth a strict rule limiting the availability of discovery in criminal cases ('no discovery shall occur in criminal cases except as provided by this chapter')," "[w]e have previously recognized that discovery in criminal cases is sometimes compelled by constitutional guarantees to ensure an accused receives a fair trial. (See, e.g., *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696 [requiring disclosure of potentially impeaching material contained in a law enforcement officer's personnel file]; *People v. Gonzalez* (2006) 38 Cal.4th 932 [requiring disclosure of the prosecution's rebuttal witnesses at the penalty phase of a capital trial]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121 [requiring disclosure of the identities of crucial prosecution witnesses].)" (*Thompson*, *supra*, 1 Cal.5th at pp. 1095; see also § 1054, subd. (e) [expressly stating discovery is available if required by "other express statutory provisions, or as mandated by the Constitution of the United States"].) Consequently, *Thompson* "'reaffirmed that a criminal defendant's right to discovery is based on the fundamental proposition that the accused is entitled to a fair trial and the opportunity to present an intelligent defense in light of all relevant and reasonably accessible information.' [Citation.]" (*Ibid.*)

We note that a defendant's due process right to material exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) is not at stake in codefendant discovery. *Brady* evidence includes evidence to impeach prosecution witnesses (*In re Brown* (1998) 17 Cal.4th 873, 879), and here defendants sought the contents of their codefendant's interview with the shopkeepers to impeach their claim at trial that Avery's actions contributed to their decision to shoot Brown. But in *Nielsen v. Superior Court* (1997) 55 Cal.App.4th 1150, the court explained that the *Brady* obligation "is the duty of the prosecution not the duty of codefendants. . . . [N]owhere in the discovery statutes or in the cases construing them is the requirement that one defendant be obligated to provide 'materially exculpatory' evidence to a codefendant . . . ." (*Id.* at p. 1156.) *Nielsen* observed that although codefendants "are often at odds in their arguments,"

14

conflicting defenses or interests at trial do not convert a codefendant into a de facto prosecutor. (*Ibid.*; see Pipes & Gagen, Jr., California Criminal Discovery (4th ed. 2008) § 2:8.3, pp. 321-322 ["Discovery procedures," including *Brady*, "do not apply to exchange of information between codfendants in a multi-defendant criminal prosecution"].)

Similarly, nothing in the record suggests the prosecutor knew of or had obtained the codefendant's interview, triggering the prosecutor's *Brady* duty if there was anything exculpatory in it. Nor did the codefendant's reciprocal discovery duties *with the prosecutor* require turning over the interview to the district attorney. Section 1054.3, subdivision (a), provides that the "defendant and his or her attorney shall disclose to the prosecuting attorney" his or her intended witnesses "together with any relevant written or recorded statements of those persons, or reports of statements of those persons . . . ." But that does not include impeachment statements a defendant obtains from prosecution witnesses. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 377, fn. 14; Pipes & Gagen, Jr., *supra*, § 4:13, p. 607 ["If the defendant has gathered information from a prosecution witness that the defendant will use only on cross-examination of that witness, the defendant is not required to divulge [it] to the prosecution"].)

The prosecutor is not entitled to statements impeaching prosecution witnesses because there is no reciprocal duty for the prosecutor to turn over similar impeachment of defense witnesses. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1167-1169.) Thus, in *Thompson*, the defendant was tried for her husband's murder along with a codefendant named Phillip who had seen the defendant shoot the victim and helped her dispose of the murder weapon. While awaiting trial, Phillip received unsigned correspondence from Thompson, copied at her behest in the handwriting of her cellmate, Jennifer Lee. The letters encouraged Phillip "to change his account of the murder, vaguely suggesting it would be financially advantageous for him to do so." (*Thompson*,

*supra*, 1 Cal.5th at p. 1063.) Phillip turned the letters over to his attorneys, who arranged an ex parte hearing with the prosecutor present, informing the court they did not want to turn the letters over to the prosecution, nor designate Lee as a witness to authenticate the letters, until Thompson testified in her own defense and "'locked herself into a position.'" (*Id.* at p. 1092.) The prosecutor agreed not to "press for disclosure at that time" and the trial court agreed Phillip would not have to disclose Lee's existence until after Thompson testified. (*Ibid.*)

Thompson was convicted of murder for financial gain and sentenced to death. On appeal, she argued that Phillip, "having decided early on to have Jennifer Lee testify to authenticate the letters, . . . was required to provide discovery of that fact to the prosecution, which would in turn have required the prosecution to disclose that information to defendant." (*Thompson*, *supra*, 1 Cal.5th at p. 1094.) Observing that "[t]he prosecution, in effect, declined to insist on its right to pretrial discovery" (*id.* at p. 1092), the Supreme Court held, "Nothing in the statutory scheme prohibits the prosecution from doing so." (*Id.* at p. 1094.) As noted, the court also concluded Phillips owed no direct duty of disclosure to Thompson because nothing in the criminal discovery provisions suggested "that the Legislature intended to authorize reciprocal discovery between codefendants being jointly tried." (*Id.* at p. 1095.)

Similarly, the high court found no constitutional violation in the delayed disclosure of the letters or Lee's identity as an authenticating witness. Rejecting Thompson's argument that the lack of discovery violated her Sixth Amendment confrontation right and her Fourteenth Amendment right to due process, the court explained: "Defendant presumably knew the content of the letters (because she wrote them) and knew of Lee's participation as well, so she could not have been caught off guard to such an extent that we might conclude she was unable to prepare a meaningful defense and thereby denied her due process right to a fair trial. She was, moreover, able

16

to cross-examine Phillip and Lee about the letters, thereby satisfying her right to confrontation.  Under the circumstances, we conclude the trial court's decision to permit Phillip to pursue a trial strategy disadvantageous to defendant Thompson did not violate her constitutional rights." (*Thompson*, *supra*, 1 Cal.5th at p. 1096.)

With this background in mind, we return to the work product posture in which the trial court considered defendants' midtrial request for discovery of their codefendant's victim interview.  In *Coito*, a civil case, the Supreme Court explained that "a witness statement obtained through an attorney-directed interview is entitled as a matter of law to at least qualified work product protection." (*Coito*, *supra*, 54 Cal.4th at p. 499.)  The work product privilege is codified by statute, which distinguishes between an absolute and qualified privilege.  (Code Civ. Proc., § 2018.030.)  An absolute privilege applies to an attorney's "impressions, conclusions, opinions, or legal research or theories," which are "not discoverable under any circumstances." (*Id.*, subd. (a))  *Coito* observed:  "It is not difficult to imagine that a recorded witness interview may, in some instances, reveal the 'impressions, conclusions, opinions, or legal research and or theories' of the attorney and thus be entitled to absolute protection.  [Citation.]  This may occur not only when a witness's statements are 'inextricably intertwined' with explicit comments or notes by the attorney stating his or her impressions of the witness, the witness's statements, or other issues in the case.  [Citation.]  It also may occur when the questions that the attorney has chosen to ask (or not ask) provide a window into the attorney's theory of the case or the attorney's evaluation of what issues are most important.  Lines of inquiry that an attorney chooses to pursue through followup questions may be especially revealing.  In such situations, redaction of the attorney's questions may sometimes be appropriate and sufficient to protect privileged material.  At other times, however, it may not do to simply redact the questions from the record, as the witness's statements will reveal what questions were asked.  Moreover, in some cases, the very fact that the attorney has chosen to interview a particular witness may disclose

17

important tactical or evaluative information, perhaps especially so in cases involving a multitude of witnesses. [Citation.] These are circumstances where absolute work product protection may apply." (*Coito*, *supra*, 54 Cal.4th at p. 495.)

But the *Coito* court also observed, "We cannot say, however, that witness statements procured by an attorney will always reveal the attorney's thought process. The Court of Appeal below posited a scenario in which an attorney collects statements from witnesses to an accident with no particular foresight, strategy, selectivity, or planning: 'What, for example, of the situation in which an attorney sends an investigator to interview all witnesses listed in a police report, and the investigator asks few if any questions while taking the witnesses' statements? Clearly, these statements would reveal nothing significant about the attorney's impressions, conclusions, or opinions about the case.' For this reason (and such scenarios do not seem uncommon), we hold that witness statements procured by an attorney are not automatically entitled as a matter of law to absolute work product protection. Instead, the applicability of absolute protection must be determined case by case." (*Coito*, *supra*, 54 Cal.4th at p. 495.)

*Coito* set out the procedure for determining whether the absolute work product privilege applies, as follows: "An attorney resisting discovery of a witness statement based on absolute privilege must make a preliminary or foundational showing that disclosure would reveal his or her 'impressions, conclusions, opinions, or legal research or theories.' [Citation.] Upon an adequate showing, the trial court should then determine, by making an in camera inspection if necessary, whether absolute work product protection applies to some or all of the material." (*Coito*, *supra*, 54 Cal.4th at pp. 495-496.)

If the trial court determines a witness statement obtained in an attorneydirected interview does not appear to involve the attorney's impressions, conclusions, opinions, or

18

other matters protected by the absolute work product privilege, disclosure does not automatically follow. To the contrary, by statute, "[a]ll other work product receives qualified protection" (*Coito*, *supra*, 54 Cal.4th at p. 485), under which the "party seeking disclosure has the burden of establishing that denial of disclosure will unfairly prejudice the party in preparing its claim or defense or will result in an injustice. [Citation.]" (*Id.* at p. 499.) As *Coito* explained, "a witness statement obtained through an attorney-directed interview is, as a matter of law, entitled to at least qualified work product protection" because "[e]ven when an attorney exercises no selectivity in determining which witnesses to interview, and even when the attorney simply records each witness's answer to a single question ("What happened?"), the attorney has expended time and effort in identifying and locating each witness, securing the witness's willingness to talk, listening to what the witness said, and preserving the witness's statement for possible future use."[4] (*Id.* at pp. 496-497.)

*Coito* examined the work product privilege in the context of a writ of mandate to compel discovery at the outset of a plaintiff's wrongful death case. (*Coito*, *supra*, 54 Cal.4th at pp. 486-488.) Section 1054.6 expressly incorporates section 2018.030's work product privilege in criminal cases, but it does so in the context of the defendant's and

---

[4] We note *Coito* did not expressly discuss Evidence Code section 915, which sets out statutory guidelines for ruling on a claim of privilege. With some exceptions not relevant here, section 915, subdivision (a), which applies to the absolute work product privilege, states "the presiding officer may not require disclosure of information claimed to be . . . attorney work product under subdivision (a) of [s]ection 2018.030 . . . *in order to rule on the claim of privilege*." (Italics added.) On its face, *Coito*'s directive that, upon an adequate initial showing of absolute work product privilege, "the trial court should then determine, by making an in camera inspection if necessary, whether absolute work product protection applies" may seem to conflict with this statutory restriction. (*Coito*, *supra*, 54 Cal.4th at p. 496.) We interpret *Coito* simply to mean that the trial court may be able to determine the absolute privilege applies without examining the claimed work product, but where the court is not able to make that determination solely upon the attorney's initial showing, disclosing the material to the court does not waive the work product privilege.

prosecutor's reciprocal disclosure duties, and therefore does not independently authorize discovery from codefendants.  (See *Thompson*, *supra*, 1 Cal.5th at pp. 1093-1095.) Section 1054.6 states in limiting language:  "Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure, or which are privileged pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States."

Consequently, as a *limitation* on the defendant's and the prosecutor's disclosure obligations, section 1054.6 provides no support for an independent duty of disclosure among codefendants.  The statute makes no such provision, express or implied, and therefore does not aid defendants' claim they were entitled to obtain the contents of their codefendant's victim interview.

Nevertheless, the procedure set out by statute and discussed in *Coito* for evaluating disclosure of attorney work product is useful for evaluating defendants' claim they are entitled to learn the contents of Bittar's interview with the shopkeepers. Specifically, an attorney's qualified work product "is not discoverable unless the court determines that denial of discovery will *unfairly prejudice the party seeking discovery in preparing that party's* claim or *defense or will result in an injustice*."  (Code Civ. Proc., § 2018.030, subd. (b), italics added; *Coito*, *supra*, 54 Cal.4th at p. 495.)  These exceptions requiring disclosure to prevent unfair prejudice in preparing a party's defense or to avoid injustice echo *Thompson*'s recognition that, while criminal discovery procedures do not provide for codefendant discovery, a defendant's constitutional right to a fair trial may require such discovery.  (*Thompson*, *supra*, 1 Cal.5th at p. 1095; § 1054, subd. (e).) Defendants do *not* assert they were entitled to the contents of Bittar's interview with the shopkeepers if the absolute work product privilege applied.  We have reviewed the sealed transcript in which Bittar attempted to show that the absolute work product privilege

20

protected the interview he and his investigator conducted with the jewelry store victims. The showing was inadequate under *Coito*, as it essentially amounted to a claim that witness statements procured by an attorney are automatically entitled to absolute protection because they always will reveal the attorney's thought process. *Coito* rejected that argument. (*Coito*, *supra*, 54 Cal.4th at p. 495.)

We therefore turn to defendants' assertion Bittar's qualified work product privilege must yield to their constitutional claims for disclosure. In their supplemental brief concerning *Thompson*, defendants acknowledge the criminal discovery provisions codified in section 1054 impose no disclosure obligation on codefendants, but they rely on *Thompson* for the proposition that "a defendant may be entitled to discovery from a co-defendant as a matter of constitutional right."[5] As the *Thompson* court acknowledged, "We have previously recognized that discovery in criminal cases is sometimes compelled by constitutional guarantees to ensure an accused receives a fair trial." (*Thompson*, *supra*, 1 Cal.5th at p. 1095.)

In the civil context, even before claims of attorney work product are implicated, inspection demands for witness statements require "'*specific facts showing good cause justifying discovery*' to obtain a court order compelling production." (Weil & Brown, Jr., Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2017) § 8:241, p. 8C-81, original italics, quoting Code Civ. Proc., § 2031.310.) "The rationale for the 'good cause' requirement is simple fairness: Each side is expected to do its own investigation and trial preparation; neither should be allowed to 'ride free on the opponent's industry.' [Citation.]" (*Id.*, § 8:241.1.) As *Coito* observed, in codifying the work product privilege, the Legislature expressly articulated its intent to "[p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (§

_____

[5] Hunter did not submit a separate supplemental brief, but because he previously joined in all Paschall's arguments potentially inuring to his benefit, we construe the supplemental brief to advance both defendants' discovery interest.

21

2018.020, subd. (b); see *Coito*, *supra*, 54 Cal.4th at p. 496 ["the Legislature's declared policy is to prevent an attorney from free riding on the industry and efforts of opposing counsel"].) We see no reason why this good cause prerequisite should not apply in the context of codefendant discovery. Indeed, it is implicit in the fact that section 1054 does not provide for such discovery, but only allows for it as required by constitutional command. (§ 1054, subd. (e).)

Notably, "[a] bare showing of 'good cause' is *not enough* to compel production of materials constituting attorney work product." (Weil & Brown, Jr., *supra*, § 8:241.3, p. 8C-81, original italics.) Instead, "[a] court will order disclosure of such materials only if the party seeking discovery can demonstrate injustice or unfair prejudice, *a much heavier burden*." (*Ibid.*, italics added, original italics omitted.) Declarations are generally used to establish the requisite good cause, and specific facts must be alleged; a bare "desire to review documents for 'context' is 'a patently insufficient ground.'" (*Id.*, § 8:1495.7, p. 8H-41.) Establishing that there is no alternative source for the information is an important factor in showing good cause, though it may not be required in every case. (*Id.*, § 8:1495.6, pp. 8H-40 to 8H-41; see also *Coito*, *supra*, 54 Cal.4th at p. 496 [observing that "a showing that a witness is no longer available or accessible, or some other showing of unfair prejudice or injustice" is necessary to overcome the work product privilege].)

Here, defendants failed to meet their burden to show good cause requiring access to Bittar's interview on grounds of ensuring a fundamentally fair trial. Analyzed in terms of the qualified attorney work product privilege, defendants did not show "that denial of discovery will unfairly prejudice the party seeking discovery in *preparing* that party's claim or defense or will result in an *injustice*." (Code Civ. Proc., § 2018.030, subd. (b), italics added.) To the contrary, the trial court reasonably could conclude defendants

22

forfeited their claim under the first prong of this language — unfair prejudice in preparing a party's defense — by failing to make their demand until the middle of trial. The time for trial preparation had long since passed by then.

Similarly, the second prong of the statute — denial of discovery will result in an injustice — encompasses defendants' due process claim that a fair trial required access to the interview, but the trial court did not err in denying defendants' request. Simply put, defendants failed to make a good cause showing to require their codefendant to produce the interview. While the initial portion of the interview was in Arabic, which defendants assert gave Bittar an advantage in eliciting potentially favorable information from the shopkeepers because of a shared linguistic background, defendants made no showing they could not locate or retain an investigator with similar skills. Nor did defendants claim they had been unable to interview the shopkeepers — they simply wanted Bittar's interview for their own use. It may have been too late by the middle of trial to secure their own interview, but the trial court reasonably could conclude there was no injustice or denial of a fair trial in applying a default rule that parties ordinarily must do their own trial preparation. This is particularly true where the Penal Code's discovery provisions do not authorize codefendant discovery. (*Thompson*, *supra*, 1 Cal.5th at pp. 1093-1095.)

Defendants also argue that as a component of their right to a fair trial, their right to confront and cross-examine Gulvartian and Pashaian necessarily included access to Bittar's written report of his interview with them. Defendants argue they "could not effectively cross examine Gulvartian *about his interview* with Bittar without knowing in advance what Gulvartian had said." (Italics added.) This tack, however, assumes the interview may have been useful to impeach Gulvartian or Pashaian. At bottom, it is mere speculation that one more account they gave Bittar included any information that would have yielded a different result. Defendants had ample opportunity to cross-examine Gulvartian and Pashaian about the shooting. Because defendants made no showing that

23

fundamental fairness required disclosure of the interview, the court did not err in denying the request.

    4.    *The Trial Court Properly Denied Defendants' Request to Call Bittar to the Stand*

Defendants contend in the alternative that the trial court erred in denying their request to call Bittar as a witness to divulge what Gulvartian or Pashaian said when he interviewed them. Defendants make no distinction between obtaining Bittar's report of the interview and calling him as a witness. In their one-page argument for the latter, they assert simply that "for the same reasons previously given as to the written report, the trial court erred in failing to allow counsel to call Bittar as a defense witness." Put another way, defendants contend that "[a]bsent a valid claim of [work product] privilege, there was no basis for prohibiting counsel from calling Bittar to the stand."

As we have explained, defendants failed to demonstrate good cause to surmount the qualified work product privilege that, as *Coito* teaches, inheres in any attorney-directed interview. (*Coito*, *supra*, 54 Cal.4th at pp. 496-497.) Because defendants assert only "the same reasons previously given as to the written report," and make no distinct analytic argument why they should have been entitled to call Bittar as a witness, their alternate claim fails. Simply put, they advance no separate argument why they should have been able to call Bittar as a witness when the qualified attorney work product privilege blocked their access to the report he prepared. We therefore must conclude the trial court's ruling was correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [appellant's burden to demonstrate error].)

Furthermore, without evidence Bittar heard the victim witnesses make inconsistent statements about why they shot Brown, defendants lacked a good faith basis to call him to the stand. Defendants' suspicion Bittar heard an inconsistent account of the incident is entirely speculative. (See *People v. Lomax* (2010) 49 Cal.4th 530, 580 [defense

24

counsel's suspicion police officers in a pretrial interview coerced or frightened witness into identifying defendant as the shooter lacked good faith basis].)  The trial court does not infringe a defendant's right to confrontation or a fair trial in precluding a crossexamination strategy unsupported by any good faith basis.  (*Id.* at pp. 778-780.)


B.      *Sufficiency of the Evidence to Support the Provocative Act Murder Conviction*

Defendants challenge the sufficiency of the evidence to support their conviction for murder based on the provocative acts doctrine.  They assert the jury could not reasonably conclude Avery's actions contributed to Brown's death because Avery already had been neutralized when Gulvartian and Pashaian later shot and killed Brown.  The defendants reason that because Avery was dead or dying, they bear no vicarious liability under the provocative acts doctrine for Brown's death because Brown charged the shopkeepers and therefore was solely responsible for his own demise.

On appeal, we must view the evidence in the light most favorable to the judgment below, indulging in all presumptions and every logical inference the trier of fact could draw from the evidence.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1156; *People v. Maury* (2003) 30 Cal.4th 342, 396.)  The test is whether substantial evidence supports the jury's conclusion (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson* (1980) 26 Cal.3d 557, 576-578), not whether the appellate panel would make the same determination.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.)  A reviewing court "'cannot substitute its evaluation of the credibility of the witness unless there is either a physical impossibility that the testimony is true or that the falsity is apparent without resorting to inferences or deductions.'"  (*In re Andrew I.* (1991) 230 Cal.App.3d 572, 578.)  Consequently, the uncorroborated testimony of a single witness is sufficient to sustain a conviction.  (*People v. Gammage* (1992) 2 Cal.4th 693, 700.)  The fact the circumstances could be reconciled with a contrary finding does not warrant reversal of

25

the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Because an appellate court must "give due deference to the trier of fact and not retry the case ourselves," an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 (*Sanchez*).)

Defendants assert the circumstances as a whole showed Pashaian and Gulvartian did not regard Avery as a threat once he fell to the floor, and therefore they could not have shot at Brown because of anything Avery did. They argue: "The events in this case certainly happened quickly, but that does not mean Gulvartian and Pashaian did not know Avery was dead — or very nearly dead — after Gulvartian shot him three times. Indeed, both of them described how Avery dropped straight down to the ground, face first . . . [o]r, as Gulvartian put it, . . . 'like a ruler.' "

Defendants portray as unworthy of belief Gulvartian's testimony he was concerned Avery may have been "'pretending' and 'playing possum' and that he might be wearing a bulletproof vest," having entered the store in military apparel. Defendants ask rhetorically, "If [Gulvartian] were truly afraid Avery might be 'pretending,' then why not shoot Avery again? He was lying face down on the floor at that point, a very easy target. Or at least kick the gun away from his hand? Not only did Gulvartian not do that, but both he and Pashaian moved out of the office, leaving Avery behind without a backward look."

But we may not reweigh the evidence in this manner. The jury was entitled to credit Gulvartian's testimony that Avery's attack "had a lot of effect" on his decision to shoot Brown and to credit Pashaian's similar testimony. Gulvartian explained that Avery's initial aggression led him to believe he was under attack and to respond accordingly. And because Avery had just violently attacked him, Pashaian believed Brown posed a similar threat. This testimony alone is sufficient to turn aside defendants' appellate challenge.

26

Moreover, there was nothing incredible or inherently dubious in Gulvartian's or Pashaian's testimony. To the contrary, the evidence amply supports the jury's verdict, particularly since Brown charged Gulvartian only three or four seconds after Avery had forcibly held Pashaian hostage. As Gulvartian explained, it "was all happening [at the] same time." When "as little as five or six seconds" separate the decedent perpetrator's acts from an accomplice defendant's provocation (*Caldwell*, *supra*, 36 Cal.3d at p. 219) or when, as here, the accomplice's initial act or acts "dramatically escalated the level of violence in the encounter" (*Gonzalez*, *supra*, 54 Cal.4th at p. 659), the trier of fact reasonably may conclude the first perpetrator "set . . . into motion . . . the chain reaction" leading to his or her fellow assailant's death, even if the dead assailant also engaged in provocative acts (*Garcia*, *supra*, 69 Cal.App.4th at p. 1333.) As *Briscoe* explained, there simply "may be more than . . . one provocative act." (*Briscoe*, *supra*, 92 Cal.App.4th at p. 585.)

Indeed, while the jury was not required to conclude Avery was dead and posed no threat, *even if it had done so*, it could still reasonably decide Avery's actions were a substantial factor in Brown's death. There is nothing unreasonable in the jury concluding that Avery's initial *armed advance*, in which he aggressively rushed at Pashaian, grabbed him, and pointed the gun at his head, set in motion everything that followed, including Brown's death. Brown only had a cell phone in his hand, but as Gulvartian testified: "The reason I shot Brown [is that] he was running towards me and I assumed he had a gun in his hand." In facing Brown's attack, Gulvartian and Pashaian could not help but recall Avery's armed charge moments before; consequently, the jury reasonably could conclude Avery's provocative act contributed to Brown's death. There is no merit in defendants' challenge to the sufficiency of the evidence.

III

## DISPOSITION

The judgment is affirmed.

ARONSON, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.