Filed 5/10/22  P. v. Chi CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B309058 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA116618) |
| v. | |
| JONATHAN CHI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven D. Blades, Judge.  Affirmed.

Kieran D. C. Manjarrez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant Jonathan Chi of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and found true the allegation that he personally inflicted great bodily injury. On appeal, defendant contends that his counsel provided ineffective assistance, the trial court erred in delivering a jury instruction and engaging in misconduct, and a juror was not competent to serve. He also requests a remand for resentencing. We affirm.

# II. BACKGROUND

A. *Information*

On April 18, 2018, the Los Angeles County District Attorney's Office (District Attorney) charged defendant by information with one count of assault with a deadly weapon (§ 245, subd. (a)(1)). The District Attorney further alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and used a deadly weapon during the commission of his crime (§ 12022, subd. (b)(1))[2].

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

[2]    The trial court later granted the prosecution's motion to strike the deadly weapon allegation.

B.    *Trial*

      1.     Events of September 2, 2017

      The parties stipulated that "on September 2, 2017, at some time after 2 a.m., the defendant . . . stabbed Jose Castro Garcia with a knife, a deadly weapon."

      On the evening of September 1, 2017, Alex Chi,[3] defendant's cousin, accompanied defendant to three bars, where the two men consumed a number of alcoholic beverages. The last bar they visited was the Chatterbox, located in Covina.

      After leaving the Chatterbox, Alex and defendant went to a nearby 7-Eleven, where defendant offered to buy items for a group of rowdy women. When the two men left the 7-Eleven, they were approached by "a couple guys," one of whom said, "[t]hose are the guys right there," referring to defendant and Alex. Alex was then hit and "knocked out." The interaction among the men was captured on a surveillance video located outside a Tastee Freeze.

      Alex eventually came to his senses and started walking toward his home when he saw defendant "laid out" on the street. Alex called out to defendant and saw him get up. Alex assumed that defendant was following as Alex traveled to and entered his house. When Alex realized that defendant was not in the house, he began calling defendant on his phone. Defendant answered several of the calls and reported that he was at various areas around the house. Alex, however, was unable to find him.

      At approximately 2:00 a.m., Jose Garcia and his girlfriend, Cindy Yeh, left the Chatterbox to purchase snacks. As they

---

[3]    We will refer to Alex by his first name for clarity.

returned to the Chatterbox, they encountered defendant, who was stumbling and appeared drunk.  Garcia asked defendant if he was alright, but defendant did not respond.  As Garcia and Yeh continued toward the Chatterbox, defendant followed right behind them.  Garcia turned around and observed that defendant had a little bit of blood around his teeth.  Defendant then pulled out a small knife and pressed it against Garcia's neck.  During the ensuing struggle, defendant's knife nicked Garcia's forehead, sliced his right shoulder, and went through his right hand.  Meanwhile, defendant kept telling Garcia to follow him.  Garcia was eventually able to control defendant and force the knife to fall to the ground.  Garcia pushed defendant away and ran towards Yeh.  When defendant headed toward them, Garcia and Yeh jogged to the Chatterbox.  Garcia would require surgery for his hand injury.

Police officers responded to the scene and ordered defendant "to the ground" several times.  It took defendant more than a few seconds to comply.  The officers arrested defendant and observed that he had blood-shot eyes and heavily slurred speech.  The strong odor of alcohol emanated from his breath.  Defendant, however, was able to respond to requests for his name, date of birth, and address.  He did not lose consciousness, look into the distance, or appear as if he could not hear what was being said to him.  Yeh told the officers that she saw a "glazed look" in defendant's eyes, "like, he was drunk."

At the time of his arrest, defendant had a "two-inch swelling on the back of his head."  Although defendant said that he had been stabbed, he did not have any injuries consistent with a stabbing.  Defendant did not remember anything about the evening because he had blacked out.

4

Los Angeles County Sheriff's deputies eventually responded to the scene, took custody of defendant, and transferred him to a hospital. At 7:58 a.m. on September 2, 2017, hospital staff administered a test for defendant's blood alcohol content and determined it to be 0.15 percent.

### 2. Defendant's Expert

Defendant called as a witness Dr. David Glaser, a neuropsychiatrist with a forensic psychiatry specialization. Dr. Glaser reviewed defendant's medical records, including his brain scans and ambulance records; surveillance video; and the preliminary hearing transcript. Dr. Glaser also personally evaluated defendant. The brain scans indicated three subdural hematomas, also known as bleeding in the brain.

Based on defendant's brain scan, the fact that defendant acted rationally before his head injury but irrationally after the head injury, defendant's mistaken belief that he had been stabbed, and his blank glazed look during his altercation with Garcia, Dr. Glaser opined that defendant's behavior was "entirely consistent with unconsciousness." Dr. Glaser explained that a person with defendant's injuries "would be unaware of their reality of the situation, unaware of the surroundings, could not act willfully." In Dr. Glaser's view, on these facts, it was most likely that defendant's conduct was caused by his having been rendered unconscious by a head injury.

On cross-examination, Dr. Glaser acknowledged that ambulance records demonstrated that defendant did not have a neurological defect and was not unconscious at the time he was transported to the hospital. Further, when defendant was

evaluated at the hospital, he was tested for consciousness and received a "perfect score" on the Glasgow coma scale. And, when asked about a hypothetical scenario involving the facts of this case, Dr. Glaser opined that the person in the hypothetical "at some point possibly" was conscious. Defendant's ability to answer questions about his name, birthdate, and address also indicated that he was conscious.

Dr. Glaser acknowledged that a blood alcohol content of 0.15 percent was twice the legal limit for driving and that defendant's blood alcohol content would have been higher five hours prior to the test. Dr. Glaser conceded that high intoxication can also cause a person to black out.

Dr. Glaser admitted during cross-examination that in November 2010, his medical license was revoked, with the revocation stayed, and he was placed on two years of probation by the state medical board. He explained that he had prescribed medication to his ex-girlfriend even though she was not a patient and had failed to keep proper records. He described his conduct as a "lapse in judgment."

C.     *Motions for New Trial and Sentencing*

Following the jury's guilty verdict, on May 7, 2019, defendant's trial counsel (prior counsel) moved for a new trial based on alleged misconduct by Juror No. 1 (first new trial motion). Defendant argued that Juror No. 1 committed prejudicial misconduct by failing to disclose he was previously arrested in 2006 for battery in Florida. On September 5, 2019, the court conducted a hearing with the parties and Juror No. 1 and denied the motion.

On September 20, 2019, a new lawyer substituted in as counsel (new counsel), and, on May 15, 2020, defendant filed a second motion for new trial (second new trial motion). In the second motion, defendant argued, among other things, that prior counsel provided ineffective assistance and the trial court should have been disqualified because it conducted an ex parte hearing with the prosecution prior to trial. Defendant also argued that Juror No. 1 committed misconduct when he failed to disclose he had a serious disability which rendered him mentally incompetent to serve. On November 12, 2020, the court denied the second new trial motion.

On November 12, 2020, the trial court sentenced defendant to the low term of two years on count 1, with an additional three-year enhancement for inflicting great bodily injury within the meaning of section 12022.7, subdivision (a), to be served consecutively, for a total sentence of five years. On November 12, 2020, defendant filed his notice of appeal.

## III. DISCUSSION

A.    *Ineffective Assistance of Counsel*

Defendant argues that prior counsel provided ineffective assistance by "failing to adequately investigate Dr. Glaser's background, by failing to counteract his looming impeachment, and by stipulating that [defendant] had 'stabbed' the victim."

7

## 1. Background

Defendant contended, in his second new trial motion, that prior counsel was ineffective by, among other things: stipulating that defendant had "stabbed" Garcia and failing to call one of defendant's treating physicians, Dr. Bayliss Yarnell, as a witness at trial.[4] In support of his motion, defendant submitted a declaration stating that: the defense plan was for defendant to testify following Dr. Glaser; defendant was not informed that the prosecution knew of Dr. Glaser's discipline; if defendant had known, he would have demanded another expert; and prior counsel told defendant that his testimony "would do more harm than good" after Dr. Glaser testified. Defendant did not, however, contend that he was denied effective assistance because his counsel failed to investigate Dr. Glaser's history of discipline or failed adequately to counteract Dr. Glaser's impeachment.

During a hearing on November 12, 2020, new counsel asserted, in reference to the board discipline materials, that "[prior counsel] wasn't aware of this impeachment evidence until [the prosecutor] gave it to him shortly before trial."[5] The trial court disagreed with new counsel's assertion that prior counsel had not conducted his own investigation, observing: "We don't

---

[4] The record reflects that prior counsel had also consulted with another expert, Dr. Joan Peter Gruen, but ultimately decided not to call her as a witness at trial.

[5] At a hearing on April 16, 2020, the prosecutor represented that he provided prior counsel with material relevant to Dr. Glaser's 2010 medical board discipline, including the "entire medical board report[ and] the probation report" immediately prior to Dr. Glaser's testimony.

know he didn't do that. All we know is he didn't tell [defendant] he did that."

The trial court rejected defendant's claims of ineffective assistance. It noted that prior counsel was a graduate of UCLA Law School, was admitted to the Bar in 1981, and appeared to the court to be "very familiar with criminal law . . ." Based on its observations of prior counsel, the court found that counsel's performance was reasonably competent and defendant could not overcome the presumption that the challenged actions were based on sound trial strategy.

### 2. Analysis

When challenging a conviction on grounds of ineffective assistance, "[a defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citations.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

""A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus

bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.'"'" (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1088; see *People v. Bell* (2019) 7 Cal.5th 70, 125.)

### a.    Investigation of Dr. Glaser's Background

Defendant argues that prior counsel failed adequately to investigate Dr. Glaser's disciplinary record. But defendant failed to establish either that prior counsel was unaware of Dr. Glaser's discipline or failed to check the status of Dr. Glaser's license. "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*People v. Stuart* (2007) 156 Cal.App.4th 165, 179.) The record therefore does not support defendant's factual assertion and defendant cannot demonstrate that counsel's performance was deficient on this ground.

### b.    Counteracting Impeachment

Defendant additionally contends that prior counsel was ineffective by failing appropriately to counter the prosecutor's impeachment of Dr. Glaser. In defendant's view, effective counsel would have taken the following steps: (1) called a different expert, Dr. Yarnell, to testify instead of Dr. Glaser; (2)

10

called Dr. Yarnell on rebuttal; (3) moved in limine to prevent the prosecutor from impeaching Dr. Glaser with his disciplinary record; and (4) elicited Dr. Glaser's disciplinary record on direct examination.

We reject defendant's contention that prior counsel was ineffective for failing to call Dr. Yarnell instead of Dr. Glaser at trial. Dr. Yarnell's one-page declaration, submitted with defendant's second new trial motion, stated his opinion that a person with defendant's injuries would have "altered levels of consciousness." Even assuming that trial counsel had interviewed Dr. Yarnell to testify as a witness—and there is no evidence that he did—counsel may have reasonably concluded that his proffered testimony was less persuasive and far weaker on the issue of unconsciousness than that of Dr. Glaser, who testified that a person with defendant's injuries "would be unaware of their reality of the situation, unaware of the surroundings, could not act willfully." Thus, defendant has failed to demonstrate that prior counsel had "no conceivable reason" to rely upon Dr. Glaser to testify.

Similarly, we reject defendant's contention that prior counsel should have called Dr. Yarnell as a "rebuttal expert." Defendant's argument seems to be that prior counsel should have called Dr. Yarnell to bolster Dr. Glaser's testimony. But counsel may have reasonably concluded that any testimony by Dr. Yarnell would provide the prosecution with an opportunity to undermine Dr. Glaser's testimony, which, as we discuss above, was stronger for defendant on the issue of unconsciousness than Dr. Yarnell's testimony would have been.

We also disagree with defendant's contention that counsel was constitutionally ineffective for failing to move in limine to

11

exclude the impeachment evidence. Dr. Glaser's discipline by the medical board was relevant to his qualifications as a medical expert. Thus, any effort to prevent the prosecution from impeaching Dr. Glaser with such evidence would be futile. (See *People v. Bell*, *supra*, 7 Cal.5th at p. 126 ["A decision not to pursue futile or frivolous motions does not make an attorney ineffective"].)

Finally, we reject defendant's contention that prior counsel was ineffective by failing to first raise Dr. Glaser's record of discipline during direct examination. Prior counsel may have reasonably believed that drawing attention to Dr. Glaser's nine-year-old disciplinary history at the outset of his testimony would focus the jury's attention in a counterproductive way; and we decline to substitute our views of trial strategy for that of trial counsel. (*People v. Bell*, *supra*, 7 Cal.5th at p. 125.) In any event, even if we were to assume that counsel's performance was deficient, we would find no prejudice as Dr. Glaser ably addressed his prior discipline, explaining that it was the result of a lapse in judgment. Accordingly, on this record, we find prior counsel did not provide ineffective assistance in addressing Dr. Glaser's prior discipline.

3.    Stipulation

Defendant next argues that prior counsel provided ineffective assistance by stipulating that he "stabbed" Garcia. "Recognizing the importance of maintaining credibility before the jury, [our Supreme Court has] repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Here, the evidence

was overwhelming that defendant used a knife's blade to injure Garcia. Admitting that he stabbed Garcia did not undermine defendant's defense that he was unconscious when he caused the injury. Accordingly, we agree with the trial court that prior counsel was not ineffective for stipulating to the stabbing.

B.    *Instruction on Unconsciousness*

Defendant contends that the trial court erred when it instructed the jury on unconsciousness. "'We review de novo whether a jury instruction correctly states the law.' [Citation.] 'Our task is to determine whether the trial court "fully and fairly instructed on the applicable law."'" [Citation.] 'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Stockman* (2020) 56 Cal.App.5th 1093, 1097.)

The trial court instructed the jury with CALCRIM No. 3425: "The defendant is not guilty of assault with a deadly weapon if he acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. [¶] Unconsciousness may be caused by a blow to the head. [¶] The defense of unconsciousness may not be based on voluntary intoxication. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious, unless based on all the evidence, you have a reasonable doubt

13

that he was conscious, in which case you must find him not guilty." Defendant asserts that the prosecution's burden of proof was lightened by the phrase "acted as if he were conscious," reasoning that the instruction failed to require the prosecution to prove that defendant was conscious when he committed assault with a deadly weapon. According to defendant, the instruction created an irrebuttable presumption that he was conscious. We disagree.

In *People v. Babbitt* (1988) 45 Cal.3d 660, our Supreme Court considered the similarly phrased 1979 version of CALJIC No. 4.31, which provided: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense. [¶] If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious." (*People v. Babbitt, supra*, 45 Cal.3d at p. 690, fn. 9.) The defendant argued that this instruction created a "mandatory, rebuttable presumption," which shifted the burden to the defendant to prove he was unconscious and thus lightened the burden on the prosecution to prove the elements of a crime. (*Id*. at pp. 690–691.) Our Supreme Court rejected that argument, concluding that because consciousness is not an element of any crime, "there is no constitutional impediment to the state's use of a rebuttable presumption in meeting its assumed burden—once the issue has been raised—to prove consciousness beyond a reasonable doubt." (*Id*. at pp. 693–694; see also *People v. Hardy* (1948) 33 Cal.2d 52,

14

63–64 [judicially created presumption that a person who acts conscious is conscious].)

Contrary to defendant's assertions, CALCRIM No. 3425 does not create an irrebuttable presumption that defendant was conscious solely because he acted as if he were conscious. Rather, when the instruction is considered as a whole (*People v. Stockman, supra*, 56 Cal.App.5th at p. 1097), CALCRIM No. 3425 instructs the jury that the prosecution bears the initial burden of demonstrating that defendant was conscious beyond a reasonable doubt. Moreover, it provides that the jury should find defendant conscious if he acted as if he were conscious "*unless* based on all the evidence, you have a reasonable doubt that he was conscious, in which case you must find him not guilty." (*Ibid*., italics added.) In other words, the presumption is rebuttable and the trial court did not err when it instructed the jury on unconsciousness with CALCRIM No. 3425.

C.     *Juror Misconduct/Competence*

Defendant next contends that the trial court erred in denying the second new trial motion because Juror No. 1 was not mentally competent to serve on the jury. We disagree.

1.     Background

At the September 5, 2019, juror misconduct hearing, Juror No. 1 stated that he had suffered from Parkinson's disease since 2007. Juror No. 1 remembered that the trial involved one individual stabbing another. He did not recall being asked during voir dire whether he had ever been arrested. Juror No. 1

15

reviewed records indicating that he had been arrested in Florida in 2006 for domestic violence and remembered that "it was with [his] ex-wife" but did not recall the details of why he was arrested.  Juror No. 1 stated that his prior arrest did not prevent him from being fair to both sides.

Prior counsel asked Juror No. 1 if he was able to follow the trial court's questions, and Juror No. 1 responded:  "Really, no. Some questions, no, because I'm sorry, I couldn't focus as I should."  When asked how Parkinson's disease affected his ability to understand what was going on around him, Juror No. 1 explained, "Because I have depression, I have loss of cognitivity [*sic*] and I get confused."  Prior counsel asked: "When you say you have a loss of cognition . . . you have a problem understanding what you see and what's going on around you?"  Juror No. 1 answered: "Understanding, yes.  Hallucinations and trouble sleeping."  Prior counsel then asked, "So when the judge was asking questions about jurors' background and history, if I understood you, you had trouble following what the judge's questions were; is that correct?"  Juror No. 1 answered, "Yes." Finally, prior counsel asked, "And did you have trouble following what was going on at trial?"  The prosecutor objected on the grounds that the response would be "[o]utside the scope of this hearing" and the court sustained the objection.

After Juror No. 1 was excused, prior counsel explained to the trial court that he wanted to inquire further into Juror No. 1's health issues at the time of trial because such testimony would be relevant to "potentially an issue about his competence." The court denied the request because "the motion for new trial is based on juror misconduct that [the juror] intentionally failed to tell us that he had a prior arrest.  And so that was the reason I

16

limited his responses to the medical information, because he did testify that he did not intentionally lie, he did not remember the question being asked."

The trial court concluded that Juror No. 1's failure to disclose his arrest was unintentional because his Parkinson's disease caused memory problems and the nondisclosure did not prejudice defendant. The court therefore denied the first new trial motion.

In the second new trial motion, defendant again argued that Juror No. 1 was untruthful during voir dire when he failed to disclose his arrest. Defendant additionally argued that Juror No. 1 "was likely not competent to serve as a juror."

During the hearing on the second new trial motion, defense counsel argued that Juror No. 1 engaged in misconduct by failing to disclose his arrest as well as his "mental and physical disabilities" during voir dire. The court disagreed and noted that as to disabilities, no one had asked the jurors "those questions." The court then denied the second new trial motion.

### 2. Analysis

A defendant is entitled to be tried by jurors who are mentally competent. (See *People v. Millwee* (1998) 18 Cal.4th 96, 144, citing *Jordan v. Massachusetts* (1912) 225 U.S. 167, 176.) "[A] 'competent' juror [is] someone '[i]n possession of his or her natural faculties and of ordinary intelligence.'" (*People v. Millwee, supra*, 18 Cal.4th at p. 144.) We presume a juror selected to serve on a jury is competent to serve and the burden is on the party seeking to demonstrate a juror's incompetency. (*People v. Brotherton* (1874) 47 Cal. 388, 396.) We review a

17

court's determination of a juror's competence for abuse of discretion.  (See *People v. Loper* (1910) 159 Cal. 6, 11.)

When responding to the trial court's standard background questions on voir dire, Juror No. 1 answered all six with no apparent difficulty.  When prior counsel asked Juror No. 1 about the saying that it is "better to let 100 guilty men go free than to put one innocent man in jail," Juror No. 1 responded that he had heard of wrongful convictions and thought them unfair.  Juror No. 1 also stated that a guilty person should not go free, but that it was worse for an innocent man to go to jail.  When the prosecutor asked Juror No. 1 whether he understood that he would be hearing the "full story" in this case, and that Juror No. 1 would be deciding whether defendant was guilty, Juror No. 1 responded affirmatively.  Thus, defendant has not demonstrated, on this record, that Juror No. 1 was not "in possession of his natural faculties and of ordinary intelligence" during the voir dire or the trial proceedings.[6]  (See also *People v. Martinez* (2010) 47 Cal.4th 911, 943 [in context of section 1089, discharge of juror during trial, "'"[b]efore an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.'  The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence"'"].)

---

[6]     Defendant does not challenge the trial court's ruling that Juror No. 1 did not engage in misconduct by intentionally failing to disclose his prior arrest or Parkinson's diagnoses during voir dire.

According to defendant, the trial court improperly prevented him from inquiring into Juror No. 1's mental competency during the hearing on the first new trial motion. We review the trial court's ruling for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 238.) The scope of the first new trial motion concerned Juror No. 1's failure to disclose his arrest during voir dire, not his competence to serve. The court therefore did not abuse its discretion in preventing defendant from inquiring into Juror No. 1's competence. Moreover, the court's ruling did not prevent defendant from further developing the record in advance of his second new trial motion by, for instance, obtaining a declaration from Juror No. 1 or other jurors about Juror No. 1's mental competency or evidence about how Parkinson's disease affects a juror's competence.

## D. *Judicial Misconduct*

Defendant next contends that the trial court engaged in misconduct when it conducted an ex parte hearing with the prosecution about impeachment evidence against Dr. Glaser.[7]

### 1. Background

On April 2, 2019, after the courtroom was cleared, the trial court conducted an ex parte hearing with the prosecutor. The prosecutor explained that: "I spoke to my supervisors on how to

---

[7] Although defendant also categorizes the issue as one of prosecutorial misconduct, he did not raise this argument below in his motions for new trial and thus has forfeited the argument on appeal. (*People v. Fuiava* (2012) 53 Cal.4th 622, 726.)

approach this.  And this is the recommendation they gave to me. So that's why I am approaching it this way.  I am here ex parte on the record.  I was not given confirmation of the defense expert until this morning. . . .  [¶]  Now, that I have been given information that Mr. Glaser is the expert that is going to be called, the People went onto the medical board and found public records on that website that indicate that he has a very specific discipline.  I don't believe under [Evidence Code section] 1054 or under any existing law I have to turn over this impeachment evidence to [defense] counsel until the guy gets on the stand.  But in the abundance of caution, I wanted to present the evidence that I have to the court, have the court review it in camera, make a determination on if I need to turn it over or not.  And at that point, if the court determines I do need to turn it over, I will do that.  If the court says, 'No,' I don't, which I believe is the case, then I will follow that order as well."

The trial court noted this was "highly unusual."  It then inquired how the prosecutor intended to use the impeachment evidence.  The prosecutor indicated that he would confront Dr. Glaser with what he admitted to the medical board.  When the court observed that it "[didn't] want to try this whole underlying case with this woman he had a relationship with[,]" the prosecutor clarified that what he requested was a ruling on whether the information was discoverable:  "the reason I'm here is because I don't believe it's my obligation to turn this particular document over."

The trial court agreed that the medical board documents were not "discovery" and were "clearly only impeachment."  The court also noted that the evidence was publicly accessible and relevant to impeachment of defendant's witness.  After the court

concluded that the impeachment evidence did not need to be produced as discovery, the prosecutor requested that the transcript of the ex parte hearing be sealed. The court granted the request.

On December 12, 2019, new counsel requested a transcript of the sealed ex parte hearing and received a copy of the transcript on April 16, 2020.

In his second new trial motion, defendant argued that the trial court committed judicial misconduct by conducting the ex parte hearing with the prosecutor.

On May 28, 2020, new counsel filed a motion to disqualify the trial judge pursuant to Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii), arguing that the judge never disclosed the ex parte hearing and had violated the canons of judicial ethics. The trial judge submitted a declaration in which he averred that he was "not prejudiced or biased against or in favor of any party to this proceeding or their counsel." On August 25, 2020, a specially appointed judge heard the motion for disqualification and denied it.[8]

---

[8]    To the extent defendant asserts it was error to deny his motion to disqualify the trial judge, we do not consider the argument. Such review is by writ of mandate only. (Code Civ. Proc., § 170.3, subd. (d).) Here, defendant asserted in his second new trial motion that he was denied "due process of law and a fair trial, based on a secret meeting between the court and the government . . . ." We can and do consider the court's rejection of his due process claim. (See *People v. Panah* (2005) 35 Cal.4th 395, 445, fn. 16.)

2.     Analysis

"'A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge.' (*People v. Cowan*[ (2010) 50 Cal.4th [401,] 455 . . . ; see *Arizona v. Fulminante*[ (1991) 499 U.S. [279,] 309 . . . ; *People v. Brown*[ (1993)] 6 Cal.4th [322,] 332 . . . .)  '[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient.  Instead, based on an objective assessment of the circumstances in the particular case, there must exist "'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable."'" (*People v. Freeman* (2010) 47 Cal.4th 993, 996 . . . , quoting *Caperton v. A.T. Massey Coal Co.*[ (2009)] 556 U.S. [868,] 877 . . . [(*Caperton*)].)  The high court has emphasized that only the most 'extreme facts' justify judicial disqualification based on the due process clause.  (*Caperton*, *supra*, [556 U.S.] at pp. 887–888 . . . .)" (*People v. Peoples* (2016) 62 Cal.4th 718, 788.)

We will assume without deciding that the trial court's holding of an ex parte hearing without notice to defendant raised the appearance of bias by the trial court.[9]  (See *People v. Brown*, *supra*, 6 Cal.4th at p. 336 [disapproving of trial court's ex parte communications with defense counsel and investigators]; but see *People v. Nieves* (2021) 11 Cal.5th 404, 485–486 [holding no state law violation when trial court held ex parte hearing solely to address discovery obligations].)  We conclude, however, that there is no "probability of actual bias on the part of the judge . . . that is too high to be constitutionally tolerable." (*People v. Peoples*,

[9]     Defendant does not assert actual bias by the trial court.

22

*supra*, 62 Cal.4th at p. 788.) We find no error in the trial court's ruling during the ex parte hearing that the prosecution was not required to produce the impeachment material as part of discovery. (See *People v. Hunter* (2017) 15 Cal.App.5th 163, 177 [prosecutor has no duty to turn over impeachment evidence of defense witnesses].) And, there is no evidence in the record of other examples of an appearance of bias by the trial court. Accordingly, based on our assessment of the circumstances in this case, we conclude there was no due process violation based on judicial bias.

E.    *Prosecutor Special Directive*

Defendant additionally contends that this case should be remanded for the trial court to consider the prosecutor's purported motion to seek resentencing of defendant on the deadly weapon enhancement. On December 17, 2020, after defendant filed his notice of appeal, the prosecutor indicated that he intended to file a motion to strike the deadly weapon enhancement pursuant to a new directive from the District Attorney. The trial court therefore set the matter for further hearing on January 19, 2021. On that date, the prosecutor stated that no motion would be filed and argued that the court did not have jurisdiction because the matter was on appeal. The court agreed with the prosecutor and took the matter off calendar.

We decline to consider the merits of the court's actions, which took place after the filing of the notice of appeal. (See *People v. Hann* (1955) 134 Cal.App.2d 389, 390; 6 Witkin, Cal. Criminal Law (4th ed. 2021) Criminal Appeal, § 54 ["In all cases, the defendant may appeal from 'a final judgment of conviction.'

[Citations.] [¶] The appeal presents for review any errors occurring in the trial, the sufficiency of the evidence to support the judgment, the validity of the judgment, and error in denying a motion for new trial. [Citation.] It does not permit review of matters occurring after judgment that are the subject of other appealable orders"].) In any event, we note that the court had previously granted the prosecutor's motion to strike the deadly weapons allegation.

F.    *Cumulative Error*

Finally, defendant maintains that the cumulative effect of the trial court's errors resulted in a fundamentally unfair trial and miscarriage of justice. "Under the 'cumulative error' doctrine, 'a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' (*People v. Hill* (1998) 17 Cal.4th 800, 844 . . . .) 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."' (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 . . . .)" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 971.) Having reviewed the entire record, we conclude there is no reasonable possibility that the trial court's assumed errors prejudiced defendant. (*People v. Peoples*, *supra*, 62 Cal.4th at p. 805.)

## IV.  DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.

We concur:



RUBIN, P. J.



MOOR, J.